**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED BROTHERHOOD OF
CARPENTERS AND JOINERS OF
AMERICA LOCAL 848; UNITED
BROTHERHOOD OF CARPENTERS AND
JOINERS OF AMERICA; AFL-CIO,
and CARPENTERS LOCAL 505,
UNITED BROTHERHOOD OF
CARPENTERS & JOINERS OF AMERICA,
AFL-CIO,
                          *Petitioners,*

UNITED BROTHERHOOD OF
CARPENTERS AND JOINERS OF
AMERICA.
                          *Intervenor,*

            v.

NATIONAL LABOR RELATIONS
BOARD,
                          *Respondent.*

No. 05-75295

NLRB Nos.
20-CA-29636-1
20-CA-29918-1

NATIONAL LABOR RELATIONS
BOARD; MACERICH MANAGEMENT,
                        *Petitioners,*

UNITED BROTHERHOOD OF
CARPENTERS AND JOINERS OF
AMERICA.
                        *Intervenor,*

              v.

MACERICH MANAGEMENT COMPANY;
MACERICH PROPERTY MANAGEMENT
COMPANY,
                        *Respondents.*

Nos. 05-76217
      05-77116

NLRB Nos.
20-CA-29636-1
30-CA-29918

OPINION

On Petition for Review of an Order of the
National Labor Relations Board

Argued and Submitted
October 15, 2007—San Francisco, California

Filed August 25, 2008

Before: Jane R. Roth,* Sidney R. Thomas, and
Consuelo M. Callahan, Circuit Judges.

Opinion by Judge Thomas;
Partial Concurrence and Partial Dissent by Judge Callahan

---

*The Honorable Jane R. Roth, Senior United States Circuit Judge for
the Third Circuit, sitting by designation.

## COUNSEL

Caren P. Sencer and David Rosenfeld, Weinberg Roger & Rosenfeld, Alameda, California, for petitioners United Brotherhood of Carpenters and Joiners of America, Local 505, United Brotherhood of Carpenters and Joiners of America, Local 848, and United Brotherhood of Carpenters and Joiners of America.

Stacey McKee Knight, Katten Muchin Rosenman, LLP, Los Angeles, California, for respondents Macerich Management Company and Macerich Property Management Company.

Linda Dreeben, David Habenstreit, Joseph P. Norelli, and Jason Walta, Washington, D.C., for respondent the National Labor Relations Board.

Jo Anne Bernhard, Sacramento, California, for amicus curiae International Council of Shopping Centers and California Business Properties Association.

Donald C. Carroll, Carroll & Scully, Inc., San Francisco, California, for amicus curiae California Labor Federation.

## OPINION

THOMAS, Circuit Judge:

This petition for review presents the question of whether six restrictions on expressive activity promulgated and enforced by two California shopping malls infringe on the free speech rights guaranteed by the California State Constitution and therefore interfere with protected union activity in violation of the National Labor Relations Act ("NLRA") when applied to union picketing and handbilling actions. We hold that the six rules impermissibly infringe free speech rights and unlawfully interfere with protected union activity.

I

Macerich Management Company and Macerich Property Management Company (collectively "Macerich") operate as the managing agents for Arden Fair Mall and Capitola Mall ("the Malls"), respectively. The Malls are enclosed, privately-owned shopping centers located in Sacramento, California, and Santa Monica, California. Macerich promulgated a list of "Rules for Public Use of Common Areas" that regulate expressive activity in each mall. Among these rules are the six at issue here:

> Rule 1 ("identification ban"): a ban on activities that identify by name the mall owner, manager, or tenants;

> Rule 2 ("commercial purpose rule"): a ban on signage and written materials that interfere with the "commercial purpose" of the mall;

Rule 3 ("signage ban"): a ban on the carrying or wearing of signs;

Rule 4 ("application requirement"): an application process that requires the pre-submission of written materials;

Rule 5 ("designated areas rule"): the exclusion of exterior areas, including mall sidewalks, from designated areas where expressive activities may occur; and

Rule 6 ("peak traffic rule"): the prohibition of expressive activities during "peak traffic days."[1]

According to Macerich, the general purpose of these rules is to safeguard the commercial activity of the malls, provide shoppers with a pleasant shopping experience, and protect shoppers' safety.

On December 16, 1999, representatives of United Brotherhood of Carpenters and Joiners of America Local 586 ("Local 586") distributed handbills at the interior and exterior entrances of the Sears store at Arden Fair Mall, to protest the use of a nonunion contractor to build a Sears store in Roseville, California. Local 586 did not file an application with the mall beforehand, nor did it submit the handbills for pre-screening, because a union representative had been told by an Arden Fair employee that an application was unnecessary. Mall security guards informed the union representatives that they were trespassing and would be arrested if they remained on the premises. When the union representatives refused to leave, mall officials called the police and one representative

---

[1]The challenged regulations are a small portion of the complete "Rules for Public Use of Common Areas," and are not numbered consecutively in those documents. We adopt the numbering used in the National Labor Relations Board ("NLRB" or "the Board") opinion.

was arrested. Later, a Local 586 representative filled out an application, which was denied as untimely, incomplete, and ambiguous. On December 21 and 22, 1999, Local 586 representatives went to Arden Fair Mall wearing shirts that said "Do Not Patronize Arden Fair Mall — Unfair to Carpenters."

On March 7, 2000, United Brotherhood of Carpenters and Joiners of America Local 505 representatives distributed handbills and picketed at Capitola Mall to protest the use of a nonunion contractor to build a new store in the mall, and to publicize an area standards dispute. The picketers left after the police arrived and warned them that they could be subject to citizen's arrest. Two weeks later, Local 505 representatives returned to Capitola Mall and again picketed the construction site. When they refused to leave, they were placed under citizen's arrest. On May 3, 2000, Local 505 representatives again picketed at Capitola Mall, this time protesting the use of another nonunion contractor. Four union representatives were arrested. In no instance did Local 505 complete an application beforehand or pre-submit written materials to the mall.

Locals 586 and 505 ("the Unions") each filed unfair labor practices charges against Macerich, alleging that Macerich had violated section 8(a)(1) of the NLRA, 29 U.S.C. § 158(a)(1), by unlawfully restricting the Unions' expressive activities, unlawfully threatening union picketers with arrest, and having union picketers unlawfully arrested. The charges were consolidated by the NLRB General Counsel into a complaint alleging that Macerich had violated section 8(a)(1) by maintaining six rules that unlawfully interfere with expressive activity, and by ejecting union representatives from mall property for engaging in protected activity.

A hearing was conducted before Administrative Law Judge Jay R. Pollack, who concluded that Macerich had engaged in unfair labor practices by promulgating, maintaining, and enforcing each of the challenged rules, and by ejecting union representatives from mall property for engaging in protected

activity. Macerich filed exceptions to ALJ Pollack's decision, and the Board's General Counsel filed cross-exceptions.

In 2005, the NRLB issued a decision affirming ALJ Pollack's decision in part. Specifically, the Board upheld ALJ Pollack's findings that the identification ban and the commercial purpose rule (Rules 1 and 2) were unlawful content-based restrictions under California law. The Board also upheld ALJ Pollack's finding that the application requirement (Rule 4) was unlawful when applied to ensure compliance with Rules 1 and 2. The Board further found, contrary to ALJ Pollack's decision, that the signage ban, the designated areas rule, and the peak traffic rule (Rules 3, 5, and 6) were reasonable time, place, or manner restrictions under California law. The Unions filed a petition for review (Case No. 05-75295), arguing that Rules 3, 5, and 6 are unlawful; Macerich filed a petition for review (Case No. 05-77116), arguing that Rules 1, 2, and 4 are permissible; and the NRLB filed a petition for enforcement of its decision (Case No. 05-76217). The Unions then filed a motion to intervene in Case No. 05-77116. By orders of December 9, 2005, and January 24, 2006, we consolidated the petitions for review with the Board's application for enforcement, and granted the Unions' motion to intervene. We now grant the Unions' petition, grant in part and deny in part the Board's petition, and deny Macerich's petition.

We review the Board's decision to determine whether the Board's findings of fact are supported by substantial evidence in the record as a whole, and whether the Board correctly applied the law. *Healthcare Employees Union v. NLRB*, 463 F.3d 909, 918 (9th Cir. 2006).

II

**[1]** Section 7 of the NLRA guarantees employees the right to form labor unions, bargain collectively, and "engage in other concerted activities for the purpose of collective bargaining or other mutual aid." NLRA § 7, 29 U.S.C. § 157.

Section 8(a)(1) of the NLRA makes it an "unfair labor practice" for an employer "to interfere with, restrain, or coerce employees" in the exercise of their section 7 rights. NLRA § 8(a)(1), 29 U.S.C. § 158(a)(1). While the NLRA by its terms confers rights only on employees, the United States Supreme Court has determined that it also restricts an employer's right to exclude nonemployee union organizers from the employer's property. *Lechmere, Inc. v. NLRB*, 502 U.S. 527, 535 (1992).

**[2]** Under *Lechmere* and subsequent cases, the rights of nonemployee union representatives to access an employer's private property are based in state law. *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 217 n.21 (1994). Where state common law grants an employer the right to exclude nonemployee union organizers from its property, the NLRA guarantees access only if the union can show that employees are otherwise inaccessible to union organizers, and that the employees' section 7 rights outweigh the employer's property rights. *Lechmere*, 502 U.S. at 538. Where state law grants nonemployee union organizers the right to access the employer's property, a violation of these state rights will also be a violation of the NLRA. *Glendale Assocs., Ltd. v. NLRB*, 347 F.3d 1145, 1153 (9th Cir. 2003). Thus, the question of whether Macerich engaged in unfair labor practices by excluding the Unions' representatives turns on whether California state law grants union representatives the right to access private mall property.

In analyzing questions of state law, we are bound by the decisions of the state's highest court. *Glendale*, 347 F.3d at 1154. The California Supreme Court has determined that article I, section 2 of the California Constitution protects expressive activities — including petitioning and picketing — conducted in privately-owned shopping centers. *Fashion Valley Mall, LLC v. NLRB*, 172 P.3d 742, 745 (Cal. 2007) (citing *Robbins v. Pruneyard Shopping Center*, 592 P.2d 341 (Cal. 1979)). The California Supreme Court has repeatedly held

that "private property can constitute a public forum for free speech if it is open to the public in a manner similar to that of public streets and sidewalks," and that a shopping center to which the public is invited provides " 'an essential and invaluable forum' " for exercising free speech rights. *Id.* at 745, 746 (quoting *Pruneyard*, 592 P.2d at 341). For this reason, privately-owned shopping centers in California are required to respect individual free speech rights on their premises to the same extent that government entities are bound to observe state and federal free speech rights. *Glendale*, 347 F.3d at 1154. The California Supreme Court has recognized that this protection of expressive activities on private property is " 'broader' and 'greater' " than that offered by the First Amendment to the United States Constitution. *Fashion Valley*, 172 P.3d at 749 (citing *Gerawan Farming, Inc. v. Lyons*, 12 P.3d 720, 735 (Cal. 2000)).

The free speech protection enshrined in the California Constitution is not absolute. Shopping malls may impose reasonable restrictions on the time, place, and manner of expressive activities. *Id.* at 750 (citing *Diamond v. Bland*, 477 P.2d 733 (Cal. 1970)). The level of scrutiny with which we review a restriction on free speech activity depends on whether the restriction is a content-neutral regulation of the time, place, or manner of speech, or a content-based restriction. *Id.* at 751. A content-neutral restriction is subjected to intermediate scrutiny to determine whether it (1) is narrowly tailored, (2) serves a significant government interest, and (3) leaves open ample alternative avenues of communication. *Id.* A content-based restriction is analyzed under strict scrutiny to determine whether the regulation is necessary to serve a compelling interest and narrowly drawn to achieve that end. *Id.* at 754. Applying these tests, we conclude that Rules 1 (identification ban) and 2 (commercial purpose rule) are impermissible content-based restrictions, and Rule 4 (application requirement) is impermissibly content-based when applied to enforce Rules 1 and 2. We conclude that Rules 3 (signage ban), 5 (designated areas rule), and 6 (peak traffic rule) are content-

neutral, but fail the intermediate scrutiny test for reasonable time, place, or manner restrictions.

A

**[3]** We begin with the Unions' challenge to Rule 1, the identification ban. The Board held that the rule banning activities identifying by name the mall owner, manager, or tenants was identical to the rule we held to be unlawful in *Glendale*.[2]

---

[2]Macerich contends that *Glendale* represents a misapplication of California law, and that the Board erred in relying on it. Even if we were not bound to follow *Glendale*, *see General Const. Co. v. Castro*, 401 F.3d 963, 975 (9th Cir. 2005) ("[w]e are bound by decisions of prior panels unless an en banc decision, Supreme Court decision or subsequent legislation undermines those decisions") (quoting *Benny v. U.S. Parole Comm'n*, 295 F.3d 977, 983 (9th Cir. 2002)), we would reject this argument.

First, Macerich argues that *Glendale* relied on *NLRB v. Calkins*, 187 F.3d 1080 (9th Cir. 1999), and that *Calkins* has been discredited. While it is true that the cases identifying First Amendment free speech protections on private property relied on by *Calkins* have been overruled at the federal level, California cases like *Pruneyard* have incorporated their principles into California law. *See Fashion Valley*, 172 P.3d at 748-49; *Pruneyard*, 592 P.2d at 346. In addition, *Calkins* addressed free speech rights on the private property of stand-alone stores, which have not taken on the functional equivalence of a traditional public forum that was found to be the compelling reason for extending free speech rights in shopping malls in *Pruneyard*. *See* 592 P.2d at 347 n.5. *Glendale*, which discusses the free speech protections in shopping malls under California law, is good law despite the weaknesses in *Calkins*.

Macerich next argues that recent decisions of the California Court of Appeal limit *Pruneyard*'s application of free speech rights on private property. Specifically, Macerich points to *H-CHH Associates v. Citizens for Representative Gov't*, in which the California Court of Appeal upheld a shopping center's proscription on the solicitation of funds from patrons and stated that solicitation need not be permitted "when it is basically incompatible with the normal character and function of the facility." 193 Cal.App.3d 1193, 1221 (Ct. App. 1987). *Fashion Valley*, which reaffirmed *Pruneyard*, silences this argument. 172 P.3d at 748-49. The *Fashion Valley* court explicitly rejected *H-CHH* to the extent that it suggested that speech may be prohibited if it competes with a shopping center's merchants. *Id.* at 753 n.12.

In *Glendale*, we began by determining whether the rule was content-based or content-neutral. 347 F.3d at 1155. Speech-regulating rules are considered content-neutral when the rules are not related to the subject or topic of the speech. *Id.* (citing *Ward v. Rock Against Racism*, 491 U.S. 781 (1989)).[3] Rules are generally considered content-based when the regulating party must examine the speech to determine if it is acceptable. *Id.* (citing *Desert Outdoor Adver. v. City of Moreno Valley*, 103 F.3d 814, 820 (9th Cir. 1996)). In *Glendale*, we determined that a rule prohibiting literature that included the name of a mall owner, manager, or tenant was content-based because the mall would have to review the literature to determine if it included an owner's, manager's, or tenant's name before approving the literature for distribution. *Id.* at 1156.[4] The same analysis applies here: the identification ban is content-based because Macerich would have to review the content of speech and literature to determine whether the speech violated the ban by naming a mall tenant, owner, or manager.

[4] Because the identification ban is content-based, we next examine it to determine whether it survives strict scrutiny. *Id.* "Content-based regulations receive strict scrutiny because 'content-based restrictions are especially likely to be improper attempts to value some forms of speech over others, or are particularly susceptible to being used . . . to distort public debate.' " *Id.* at 1155 (quoting *City of Ladue v. Gilleo*, 512 U.S. 43, 60 (1994) (O'Connor, J., concurring)).[5] Content-

---

[3]California state courts borrow from federal First Amendment jurisprudence to analyze whether a rule is content-based or content-neutral. *Glendale*, 347 F.3d at 1155.

[4]In *Glendale*, we also found the rule to be content-based because it allowed exceptions for commercial literature naming a mall owner, manager, or tenant, and for literature from groups and persons who were in a primary labor dispute with a mall tenant. These additional details enhance the content-based nature of the regulation, but were not necessary to a finding that the regulation was content-based.

[5]California state courts also draw from First Amendment jurisprudence to determine whether a content-based rule survives strict scrutiny under the California Constitution. *Glendale*, 347 F.3d at 1156.

based restrictions are presumptively unconstitutional; a content-based restriction will pass constitutional muster "only if it employs the least restrictive means to further a compelling interest." *Id.* at 1156 (citing *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992) and *Frisby v. Schultz*, 487 U.S. 474, 483 (1988)). The burden is on the regulating authority to prove that the restriction is justified without reference to the content of the speech. *Id.* (citing *Rock Against Racism*, 491 U.S. at 791). Courts have consistently struck down restrictions based in hostility or favoritism towards particular messages. *Id.* at 1157-58.

In *Glendale*, the mall argued that its ban on the naming of an owner, manager, or tenant served its interest in ensuring that normal business operations were not disrupted. *Id.* We held that this stated interest was belied by the fact that the mall made an exception for speech promoting primary boycotts of mall tenants, speech that was likely to be the most disruptive of normal business operations. *Id.* at 1157. We also held that the rule was untenable because it was motivated by hostility towards messages that might adversely affect business. *Id.* at 1157-58. We stated, "[i]n restricting such critical speech about their tenants, owners, or managers, [the] rule contravenes the purpose of California free speech protections: the preservation of discussion of issues even when they are contrary to a regulating party's belief or interest. . . . The California Constitution does not permit censorship of contrary ideas." *Id.* at 1158.

**[5]** Macerich asserts a similar interest here. Susan Valentine, Senior Vice President of Marketing for Macerich, testified that Macerich adopted the identification ban to protect the "good name" of the mall and its tenants. This stated justification exposes Macerich's hostility towards messages critical of the mall or its tenants. Because free speech protections were designed to protect critical speech, we cannot find the suppression of critical speech to be a compelling interest. We find that "[t]he Mall's purpose to maximize the profits of its

merchants is not compelling compared to the Union's right to free expression." *Fashion Valley*, 172 P.3d at 754. Macerich has provided no justification for the identification rule that does not reference the content of the speech. We therefore find that Rule 1 (the identification ban) does not survive strict scrutiny.

B

**[6]** The same analysis applies to Rule 2, the commercial purpose rule. We begin by analyzing whether the rule is content-based or content-neutral. Rule 2 prohibits signage and written materials that interfere with the "commercial purpose" of the mall. As with the identification rule, this rule requires that the regulating authority examine the content of the written material to determine whether it complies with the rule. Like the identification rule, the commercial purpose rule is content-based.

Next, we address whether Rule 2 survives strict scrutiny. Valentine and Carmen Lytle, Arden Fair's General Manager, explained that the commercial purpose rule was intended to eliminate written materials that would financially damage the mall or its tenants. The Board concluded that the purpose of the rule was to "place restrictions on the content of the message so as to limit any negative publicity and not hurt sales." Rule 2 is entirely motivated by hostility towards messages critical of the mall or its tenants. Macerich offers no content-neutral justification for the rule. Therefore, the commercial purpose rule cannot survive a strict scrutiny analysis.

Our conclusion is supported by the California Supreme Court's recent decision in *Fashion Valley*. In *Fashion Valley*, the California Supreme Court analyzed a mall rule that prohibited speech "[u]rging, or encouraging in any manner, customers not to purchase the merchandise or services offered by any one or more of the stores or merchants in the shopping center." 172 P.3d at 744. The Court determined that the rule

was content-based because it distinguished favored speech from disfavored speech based on the ideas expressed: speech urging a boycott was prohibited, but other speech was not. *Id.* at 751-52.

*Fashion Valley* distinguished the boycott rule from rules prohibiting face-to-face solicitation of funds, which have been held to be content-neutral. The Court explained that solicitation bans are concerned with the manner of speech, and are directed at "the conduct and intrusiveness that face-to-face solicitation for immediate donation or exchange of funds inherently promotes." *Id.* at 752-53. *Fashion Valley* expressly rejected the mall's argument that the ban on speech advocating a boycott could be similarly justified as a restriction on the manner of speech. *Id.* at 750, 753 (rejecting the mall's argument that the boycott ban was "a 'reasonable regulation' designed to assure that free expression activities 'do not interfere with normal business operations' . . ."). Unlike solicitation, the Court noted, peacefully urging a boycott does not by its nature cause congestion or promote fraud or duress. *Id.* at 753.

As the California Supreme Court noted, shopping centers are free to "prohibit *conduct* 'calculated to disrupt normal business operations' or that would result in 'obstruction of or undue interference with normal business operations.' " *Id.* (quoting *Diamond*, 477 P.2d at 733) (emphasis ours). However, "speech that does no more than attempt to peacefully persuade customers not to patronize a business cannot be banned on the ground that it interferes with normal business operations." *Id.* at 751 n.8. *Fashion Valley* explained that the "distinction between urging customers to boycott a business and physically impeding access to that business" is crucial. *Id.* The California Supreme Court also noted that citizens have a "strengthened interest, not a diminished interest, in speech that presents a grievance against a particular business in a privately owned shopping center, including speech that advocates a boycott." *Id.* at 750.

**[7]** The commercial purpose rule at issue here, which was put in place to limit speakers' abilities to persuade customers not to patronize certain businesses, is an attempt to restrict the speakers' ability to persuade. The rule does not prohibit conduct that would interfere with normal business operations, but instead infringes upon the strong free speech interest in peacefully presenting a grievance to an offending business. Because limiting critical speech is an impermissible regulatory goal, Rule 2 cannot survive a strict scrutiny analysis.

## C

**[8]** The NLRB correctly held that Rule 4 (application requirement), when used to enforce the unlawful Rules 1 (identification ban) and 2 (commercial purpose rule) is likewise unlawful. The Board reasoned that because the application process is used to screen written material for compliance with the rule banning the identification of a mall owner, manager or tenant, and with the rule banning signage that interferes with the commercial purpose of the Malls, the rule is content-based. We agree, and reiterate that the examination of the content of a speaker's message is the hallmark of a content-based rule. The application requirement becomes unlawful when used as a tool to ferret out objectionable content.

Our conclusion is consistent with that of the California Court of Appeal in *H-CHH*, in which the Court struck down as constitutionally defective an application process used to screen for expressive activity that would adversely affect the shopping center environment, atmosphere, or image. 193 Cal.App.3d at 1211.[6]

---

[6]Macerich argues that our analysis should be guided instead by *Union of Needletrades, Industrial & Textile Employees, AFL-CIO v. Superior Court*, 56 Cal.App.4th 996 (Ct. App. 1997) ("*UNITE*"), in which the California Court of Appeal upheld an application process for expressive activity in a shopping mall. *UNITE* gives no guidance because the Court did not address whether the underlying restrictions on naming tenants and on interfering with the commercial purposes of the mall were valid, as it found that those issues had not been properly preserved for review. *Id.* at 1020-21.

Macerich argues that even if Rules 1 and 2 are unlawful, the Board's order is overbroad because it invalidated the application process entirely, even when used to further legitimate goals like proper scheduling of events. This argument misstates the Board's order. The order enjoins Macerich from "[m]aintaining and enforcing a rule that requires the presubmission of written materials *for the purpose* of enforcing" the unlawful identification and commercial purpose rules (emphasis ours). We construe this statement to mean that the application process may remain in use insofar as it is used to promote legitimate time, place, and manner restrictions on expressive activities. So construed, there is nothing overbroad about the holding.

## D

**[9]** We turn to the Unions' challenge to Rule 3, the ban on carrying or wearing signs. The NRLB concluded that Rule 3 was a reasonable restriction on the time, place, or manner of speech. To be enforceable, restrictions on time, place, or manner must (1) be justified without reference to the content of the regulated speech, (2) be narrowly tailored to serve a significant interest, and (3) leave open ample alternative channels for the communication of the information. *Berger v. City of Seattle*, 512 F.3d 582, 589 (9th Cir. 2008) (citing *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984)).[7] Failure to satisfy any single prong of this test invalidates a regulation. *Kuba*, 387 F.3d at 858 (quoting *Grossman v. City of Portland*, 33 F.3d 1200, 1205 (9th Cir. 1994)).

The Unions concede that Rule 3 is content-neutral, but argue that it is not narrowly tailored to promote a significant mall interest and does not leave open ample alternatives for communication. To prove that a regulation is narrowly tai-

---

[7]California Courts apply federal precedent to determine whether a rule is a reasonable time, place, or manner restriction. *See Kuba v. 1-A Agric. Ass'n*, 387 F.3d 850 (9th Cir. 2004).

lored to serve a significant interest, the regulating authority must identify the interests served by the restriction and provide evidence that the proposed communicative activity endangers those interests. *Id.* at 858-59. Speculation as to what might happen if the proposed activity was allowed is insufficient. *Id.* at 859-60 (finding lack of evidence to support ban on demonstrating where city failed to provide evidence beyond a "first hand" account that "there is simply no space in the fire lanes or the concrete apron in which [demonstrators] would be safe . . ."). Studies, anecdotes pertaining to different locales, history, consensus, and "simple common sense" may serve as evidence that the proposed activity will endanger significant interests. *G.K. Ltd. Travel v. City of Lake Oswego*, 436 F.3d 1064, 1073 (9th Cir. 2006). In the case of safety restrictions, for example, the regulating body need not wait until someone is injured before promulgating regulations. *Edwards v. City of Coeur d'Alene*, 262 F.3d 856, 865 n.16 (9th Cir. 2001).

Macerich argues that Rule 3 (signage ban) is justified by convenience, safety, and aesthetic concerns. Valentine testified that the signage ban is necessary to prevent people from having to walk out of their way to avoid expressive activities, keep signage looking professional, and protect individuals from injuries caused by signs or the sticks they are attached to. We generally consider safety and convenience to be valid regulatory objectives. *Berger*, 512 F.3d at 592. In at least some circumstances, we have recognized aesthetics to be a significant interest. *See Foti v. City of Menlo Park*, 146 F.3d 629, 637 (noting that while cities do have a substantial interest in protecting the aesthetic appearance of their communities by avoiding visual clutter, these interests may not be compelling.). Common sense supports the idea that picketers' signs may inconvenience retailers and customers by blocking sight lines in shopping centers, although the record does not include evidence to reinforce this conclusion. Similarly, common sense suggests that rigid signs with sharp corners, especially

if attached to sharp or heavy sticks, could pose a threat to safety.

**[10]** While there may be sufficient common sense support for Macerich's assertion that the proposed communicative activity endangers significant interests, the signage ban is not narrowly tailored to serve those interests. For a regulation to be narrowly tailored, the stated interest must be served "less effectively absent the regulation," and the regulation may not "burden substantially more speech than is necessary to further the [regulating authority's] legitimate interests." *Kuba*, 387 F.3d at 861. The regulation need not advance the regulating authority's interests in the least restrictive or least intrusive way, *G.K.*, 436 F.3d at 1074, but the existence of numerous obvious and less-burdensome alternatives is relevant to the regulation's "fit," *Edwards*, 262 F.3d at 865 (quoting *Cincinatti v. Discovery Network, Inc.*, 507 U.S. 410, 418 n.13 (1993)).

**[11]** The complete ban on wearing or carrying signs eliminates any safety or aesthetic concern associated with signs or sign poles. For that reason, it may be said that Macerich's interests would be served less effectively absent the ban.[8] However, Rule 3 burdens substantially more speech than is necessary to further Macerich's legitimate interests. Rule 3 doesn't just ban speech that is communicated in dangerous or intrusive ways; it bans virtually all speech communicated visually through images and text.[9] Moreover, numerous obvi-

---

[8]The dissent would have us stop here, before analyzing whether the regulation burdens substantially more speech than is necessary to further Macerich's legitimate goals or determining whether numerous obvious and less-burdensome alternatives exist. The volume of speech burdened and the availability of numerous alternatives are appropriate considerations in a complete and thorough narrow tailoring analysis. We are not, as the dissent suggests, insisting that the challenged regulation be the "least restrictive means" for achieving Macerich's goals. We agree that such an analysis would be inappropriate where, as here, intermediate scrutiny is the appropriate standard. *See, e.g.*, *Ward*, 491 U.S. at 797.

[9]There are exceptions, of course. The Unions could have distributed handbills or attached two signs to a table within an area designated for expressive conduct.

ous and less burdensome alternatives exist. The same safety considerations could be served by eliminating signs with particularly dangerous characteristics. Macerich could, for example, insist that signs be made from soft materials, have rounded corners, or be attached to cardboard poles. Aesthetic and convenience concerns could be promoted by restricting the size of signs or allowing demonstrators to wear signs in the form of lettering on t-shirts. Because the complete ban on carrying or wearing signs is substantially overbroad, it cannot satisfy the requirement that the restriction be "narrowly tailored."

Even if we held the signage ban to be narrowly tailored to serve a significant interest, it would fail intermediate scrutiny because it fails to leave open ample alternatives for communication.[10] *See Kuba*, 387 F.3d at 858. A regulation that effectively prevents a speaker from reaching his intended audience fails to leave open ample alternatives. *Edwards*, 262 F.3d at 866. Where "there is no other effective and economical way for an individual to communicate his or her message," alternative methods of communication are insufficient. *Id.* We will not invalidate a regulation merely because it restricts the speaker's preferred method of communication. *Id.*; *see also Savage v. Trammel Crow Co.*, 223 Cal.App.3d 1562, 1575 (Ct. App. 1990) ("The adequacy of alternative channels is not measured by the fondest hopes of those who wish to disseminate ideas."). However, a regulation that forecloses an entire medium of public expression across the landscape of a particular community or setting fails to leave open ample alterna-

---

[10]The dissent essentially asks us to ignore this prong of the analysis, stating that "the Supreme Court has repeatedly admonished lower courts not to use the 'ample alternative channels' requirement as a means of overturning regulations." The cases cited by the dissent, however, stand for the proposition that this Court may not overturn a valid time, place, or manner restriction on the grounds that we disagree with the regulating authority's methods. *See, e.g., Ward*, 491 U.S. at 799. These cases do not suggest that the "ample alternative means" requirement is no longer a valid prong of the time, place, and manner analysis.

tives. *G.K.*, 436 F.3d at 1074. As we noted in *Foti*, free speech protections extend to the "right to choose a particular means or avenue of speech . . . in lieu of other avenues." 146 F.3d at 641.

We are particularly wary of any regulation that completely forecloses "a venerable means of communication that is both unique and important." *Gilleo*, 512 U.S. at 55. Picketing is one such venerable medium and has unique advantages over other forms of communication, including immediate recognition by passers-by. *Foti*, 146 F.3d at 641. In *Edwards*, we invalidated an ordinance banning the attachment of wooden or plastic supports to signs carried during parades and assemblies because "the classic image of a picketer — dating back to the early days of labor protests — is of an individual holding aloft a sign-bearing standard." 262 F.3d at 865.

Moreover, when picketing is the chosen means of communication, the location of the protest is particularly important. As the California Supreme Court reiterated in *Fashion Valley*: "When the activity to be protected is the right to picket an employer, the location of the employer's business is often the only effective locus; alternative locations do not call attention to the problem which is the subject of the picketing and may fail to apply the desired economic pressure." 172 P.3d at 748 (citing *Diamond*, 447 P.2d at 733).

**[12]** Here, the NLRB found that the signage ban left open ample alternatives for communication because the Unions were still able to advertise their dispute in the media and picket and handbill on public property. The Board now argues that the mall regulations allow the Unions to attach two signs to a table, thus granting them the advantage of immediate recognition by passers-by. We conclude that these alternatives are legally inadequate. While attaching two signs to a table might allow the Unions to communicate with passers-by, such a communication method fails to convey the same message of protest associated with "an individual holding aloft a sign-

bearing standard." Picketing and handbilling on public property, while preserving the symbolism of the hand-held sign, would fail to reach the Unions' intended audience: patrons of the Malls or of particular stores within the Malls. Physically removing the protest from the offending employer's location would seriously diminish the symbolic and economic impact of the message. Advertising the dispute in the media would similarly fail to target the desired audience, and is significantly more expensive. The signage ban left the Unions with a narrow range of ineffective options. Because the signage ban is not narrowly tailored and does not leave open ample alternatives for communication, the Board incorrectly applied the law in determining that Rule 3 was a reasonable time, place, or manner restriction.

E

**[13]** The Board also found that Rule 5, excluding exterior sidewalks from the designated areas where expressive conduct may occur, was a lawful time, place, or manner restriction.[11] Because the Unions concede that this rule is content-neutral, we begin by examining whether it is narrowly tailored to serve a significant interest.[12]

---

[11]Federal courts have consistently protected expressive activities on public sidewalks. *See, e.g.*, *United States v. Grace*, 461 U.S. 171 (1983) (invalidating statute prohibiting distribution of leaflets and display of signs on sidewalks on Supreme Court grounds because not narrowly tailored). California Courts have extended the same protection to privately-owned sidewalks surrounding privately-owned shopping malls. *See In re Lane*, 457 P.2d 561 (Cal. 1969) (reaffirmed in *Fashion Valley*, 172 P.2d at 747).

[12]The dissent avoids this analysis by claiming that the validity of a regulation restricting petitioning activities to two designated areas has already been determined by the California courts. The dissent cites the California Court of Appeals's decision in *UNITE*, 56 Cal.App.4th at 1012. The dissent then claims that a "state appellate court's determination of state law is binding and must be given deference," citing *Hicks v. Feiock*, 485 U.S. 624, 629-30, 630 n.3 (1988) for support. *Hicks* actually says that a federal court is not to apply a rule different from that stated by the state intermedi-

According to Valentine, limiting expressive activities to certain designated areas is necessary to preserve traffic flow and ensure compliance with fire codes. Macerich excluded sidewalks from the designated areas for expressive activities because of a concern that mall patrons would have to step into the street to avoid expressive activity on sidewalks, thereby jeopardizing their safety. The Unions acknowledge that these safety and convenience interests are significant, but argue that the exclusion of sidewalks from the designated areas for expressive activity is not narrowly tailored to advance these interests.

[14] Specifically, the Unions argue that the mall sidewalks are no different from — or narrower than — sidewalks in most downtown areas, on which expressive activities are permitted. This reasoning finds support in *Grace*, in which the United States Supreme Court stated, "the building's perimeter sidewalks are indistinguishable from other public sidewalks in the city that are normally open to the conduct that is at issue here. . . ." 461 U.S. at 182. The California Supreme Court has acknowledged that "[p]ersons can be excluded entirely from areas where their presence would threaten personal danger or block the flow of passenger or carrier traffic, such as doorways and loading areas." *In re Hoffman*, 434 P.2d 353, 358 (Cal. 1967). However, Rule 5 restricts significantly more than activity in doorways and loading areas.

---

ate appellate court where "the highest court has refused to review the lower court's decision rendered in one phase of the very litigation which is now prosecuted by the same parties before the federal court." *Id.* at 630 n.3. This is not the case here. *Hicks* also states that "where an intermediate appellate state court rests its considered judgment upon the rule of law which it announces, that is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *Id.* A thorough time, place, and manner analysis convinces us that the California Supreme Court would conclude that the exclusion of sidewalks from the designated areas for expressive activities violates free speech protections.

The Unions argue that numerous obvious and less restrictive alternatives could achieve the Malls' goals. For instance, they suggest that fire code compliance could be ensured by regulations prohibiting expressive activities in entrances and other locations that must be kept clear. *Cf. Berger*, 512 F.3d at 603 (upholding rule restricting expressive activity to sixteen designated locations because the rule furthered "significant city interests, by keeping street performances from posing threats to the flow and convenience of . . . patrons in heavily congested areas and entrances to buildings"). We agree, and add that regulations prohibiting the restriction of traffic flow on sidewalks would sufficiently address the other safety and convenience concerns.[13]

Rule 5 also fails to leave open ample alternatives for communication. We have previously recognized that effective communication depends on the speaker's ability to address the intended audience. In *United States v. Baugh*, for example, we held that a statute requiring a permit to demonstrate on National Park property was unlawful when applied so as to refuse a group permission to demonstrate in front of a Park's visitors' center. 187 F.3d 1037, 1044 (9th Cir. 1999).

---

[13]Macerich argues that *UNITE*, 56 Cal.App.4th at 1010-13, compels a contrary conclusion. We note that the rule discussed by the California Court of Appeal in *UNITE* prohibited a demonstration in front of a particular store because the demonstration would have violated a fire code. The *UNITE* court held that the preferred demonstration area was not an appropriate place to conduct expressive activities. *Id.* at 1012. In the situation at issue here, no fire code was shown to have been violated; there is no demonstrated reason that sidewalks are not an appropriate place for expressive activities. While the reasoning in *UNITE* was extrapolated to apply to several other mall rules, including rules that are more similar to Rule 5, the *UNITE* court did not perform a narrow tailoring analysis on any restriction other than that prohibiting a demonstration that would have violated a fire code. Because the analysis of whether a restriction on expressive activity is sufficiently narrowly tailored is necessarily a fact-specific inquiry, *see Berger*, 512 F.3d at 601-04 (analyzing whether several restrictions on the location of speech activities sufficiently matched the stated interests), *UNITE* does not guide our analysis here.

We noted that the demonstrators were ordered to a "First Amendment area" 150 to 175 yards away from the visitors' center where their target audience was located, and that this was an insufficient alternative for communication because the demonstrators were "left with no alternative that allowed [them] to reach [their] intended audience." *Id.*

**[15]** Here, the Malls cover large areas and have numerous entrances. By banning expressive activity on sidewalks and confining expressive activity to designated areas which may be hundreds of yards from any given store or its patrons, Macerich has effectively cut off access to the Unions' intended audience(s). The fact that the Unions may still advertise their dispute in the media, and picket and handbill on public property, again fails to cure the constitutional infirmity. Because Rule 5 is not narrowly tailored and does not leave open ample alternatives for communication, it is not a lawful time, place, or manner restriction.

F

**[16]** Finally, we turn to Rule 6, the prohibition on expressive activities during peak traffic periods. As applied by both Malls, Rule 6 prohibits expressive activity throughout almost the entire holiday shopping period: the time from Thanksgiving through the end of December. During this period, mall traffic doubles, and the Malls' tenants do 75% of their yearly business. Based on this evidence of increased mall traffic, the Board found the peak traffic rule to be justified by interests in public safety, preserving traffic flow, and controlling congestion.

A complete ban on expressive activities is narrowly tailored only where "each activity within the proscription's scope is an appropriately targeted evil." *Frisby*, 487 U.S. at 485. Macerich has failed to explain how banning every expressive activity during peak times advances a significant interest. Instead, Macerich attempted to justify the entire ban as a

"common sense" measure to decrease crowding during peak times. Numerous less restrictive alternatives would promote the same interest, including a limit on the number of individuals engaged in expressive activities at any one time.[14] Although a regulation need not be the least restrictive method of advancing a compelling interest, *G.K.*, 436 F.3d at 1074, the complete ban at issue here is certainly overbroad.

[17] The complete ban on expressive activities, more than any of the other mall rules, fails to leave open ample alternatives for communication. Again, Macerich suggests the alternatives of media advertising, demonstrations on public property, and expressive activity in the Malls during the days of the year when such activity is not entirely prohibited. As discussed above, the options of media advertising and picketing on public property are neither effective nor economical. Limiting expressive activity to non-peak times eliminates the opportunity to comment upon or criticize — directly and in-person — tenants' actions during the time that they make 75% of their sales, and forecloses any chance of effectively reaching a large percentage of the target audience. For these rea-

---

[14]The Board points to *H-CHH* and *UNITE*, in which California courts upheld similar restrictions on expressive activities during peak traffic periods, to support its conclusion that the peak traffic rule is permissible. Because neither *H-CHH* nor *UNITE* explicitly addressed whether the regulations in question were narrowly tailored, we do not find them informative in this analysis. The dissent also cites *Costco Cos., Inc. v. Don Gallant*, 96 Cal.App.4th 740, 753 (Ct. App. 2002). The context in *Costco* was markedly different from that in the present case. Costco supplied evidence that petitioner gatherers in its store had directly interfered in the store's business, and imposed considerable expenses, administrative burdens, and risks. *Id.* at 750-51. Petition gatherers had physically and verbally abused staff and customers, and altercations between proponents and opponents of particular petition gathering efforts had escalated to the point that rifles had been pointed at petition gatherers. *Id.* at 751-52. Given these circumstances, the court determined that Costco had the right to impose regulations designed to protect its business operations, and that limiting interferences to its less profitable days was a rational restriction. *Id.* at 753.

sons, the peak traffic rule is not a reasonable time, place, or manner restriction.

## III

Rules 1 (identification ban) and 2 (commercial purpose rule) are impermissible content-based restrictions on expressive activity. Rule 4 (application requirement) is likewise unlawful when used to enforce Rules 1 and 2. Rules 3 (signage ban), 5 (designated areas rule), and 6 (peak traffic rule) are content-neutral, but cannot be justified as reasonable restrictions on the time, place, or manner of expressive activities. Because the promulgation and enforcement of each of these rules impermissibly infringes on the free speech rights preserved by the California Constitution, we hold that the Malls had no right to exclude union representatives from their premises under state law. The enforcement of the contested mall rules against Union representatives, and the exclusion of the Union representatives from mall property, was therefore a violation of section 8(a)(1). We grant the Unions' petition, grant in part and deny in part the Board's petition, and deny Macerich's petition.

**PETITIONS GRANTED IN PART; DENIED IN PART**

---

CALLAHAN, Circuit Judge, concurring in part and dissenting in part:

I agree that Macerich's efforts to impose content-based restrictions (rules 1, 2, and 4) on speech do not survive strict scrutiny. I respectfully dissent from the majority's holding that Macerich's admittedly content-neutral time, place, and manner restrictions (rules 3, 5, and 6) are unlawful under the National Labor Relations Act ("NLRA") because the California courts have approved the challenged restrictions. The federal courts may not ignore state case law balancing the

freedom of expression under the state constitution against state property laws; particularly where there is no federal right to engage in the particular expressive activity on private property.

In labor relations, "[t]he ultimate problem is the balancing of the conflicting legitimate interests. The function of striking that balance to effectuate national labor policy is often a difficult and delicate responsibility, which the Congress committed primarily to the National Labor Relations Board, subject to *limited* judicial review." *NLRB v. Truck Drivers Local Union No. 449*, 353 U.S. 87, 96 (1957) (emphasis added). We accord considerable deference to the National Labor Relations Board's ("NLRB" or "Board") interpretation of the NLRA as long as it is "rational and consistent" with the statute. *NLRB v. Calkins*, 187 F.3d 1080, 1085 (9th Cir. 1999). We uphold decisions of the NLRB on appeal if the findings of fact are supported by substantial evidence and if the agency correctly applied the law. *Retlaw Broadcasting Co. v. NLRB*, 172 F.3d 660, 664 (9th Cir. 1999). It is well-settled that the NLRB is bound by state law when determining the right of nonemployee union representatives to access an employer's private property. *See Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 217 n.21 (1994); *Lechmere, Inc. v. NLRB*, 502 U.S. 527, 535 (1992). Therefore, it follows that if California courts hold that a time, place, or manner restriction is permissible under California law, then the NLRB should be entitled to rely on those cases when attempting to determine if a mall has violated NLRA section 8(a)(1).

A.  California courts properly apply intermediate scrutiny to content neutral restrictions on free speech on private property.

A content-neutral time, place, and manner restriction must be "narrowly tailored to serve a significant governmental interest," and "leave open ample alternative channels for the communication of the information." *Ward v. Rock Against*

*Racism*, 491 U.S. 781, 791 (1989). "A statute is narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." *Frisby v. Schultz*, 487 U.S. 474, 485 (1988). Whether a regulation leaves open ample alternative channels for communication of the information requires analyzing if the message "could not be communicated in other ways" and the barriers to conveying the intended message. *Clark v. Cmty for Creative Non-Violence*, 468 U.S. 288, 294 (1984). "[A]n incidental burden on speech is no greater than is essential, and therefore is permissible under [*United States v.*] *O'Brien*[, 391 U.S. 367, 377 (1968)], so long as the neutral regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *United States v. Albertini*, 472 U.S. 675, 689 (1985). "The validity of such regulations does not turn on a judge's agreement with the responsible decision-maker concerning the most appropriate method for promoting significant government interests." *Id.*

There is no federal right to engage in First Amendment activity that is unrelated to the business of a privately owned shopping center. *Hudgens v. NLRB*, 424 U.S. 507, 518 (1976); *Lloyd Corp. v. Tanner*, 407 U.S. 551, 570 (1970). California has chosen to provide additional protection for expressive activity in private shopping malls under article I, section 2 of the California Constitution. *Fashion Valley Mall, LLC v. NLRB*, 172 P.3d 742, 749-50 (Cal. 2007). California courts have concluded, however, that shopping malls may impose reasonable time, place, and manner restrictions upon speech. *Robins v. Pruneyard Shopping Ctr.*, 592 P.2d 341, 347 (Cal. 1979); *see also Fashion Valley Mall*, 172 P.3d at 754 (reaffirming that "[s]hopping malls may enact and enforce reasonable regulations of the time, place, and manner of such free expression to assure that these activities do not interfere with the normal business operations of the mall . . ."). California law allows content-neutral regulation of speech by municipalities and private actors if the regulations are narrowly tailored to protect a proper municipal or private

interest. *See In re Hoffman*, 434 P.2d 353, 355-56 (Cal. 1967) (discussing balancing use of property for municipal or private purposes and the First Amendment). Because California courts apply the exact same scrutiny to time, place, and manner restrictions on First Amendment activity as federal courts, the NLRB is entitled to rely upon a California court's determination that restrictions similar to those imposed by Macerich are proper methods of protecting private property rights under state law.

B.    The majority's decision fails to give proper deference to the mall's time, place, and manner regulation of the wearing and carrying of signs.

Macerich has not imposed a complete ban on the use of signs, but rather has a rule that "[p]articipants may not carry or wear any signs, posters or placards."[1] Macerich *allows* posters, placards, displays and signs that are smaller than 22 inches by 28 inches and are affixed to a table "so as not to endanger any person or property, block the view of any tenant's store or display, or directly compete with Center activities or the business displays or logos of Center tenants."

California courts have recognized that private property owners have different interests than municipalities for the purposes of balancing those interests against First Amendment rights. *In re Hoffman*, 434 P.2d at 355 n.3. Private property owners have an interest in avoiding interference with the commercial purposes of property.[2] *Id.* at 356-67. This

---

[1]Strangely, the majority omits the first part of the rule, which states, "[p]articipants may hold clipboards and leaflets."

[2]The majority claims that the state court decisions approving content-neutral restrictions on expressive activity do not include the right to exclude. California courts have repeatedly stated that unprotected interference with the operation of commercial property may result in expulsion. *See In re Hoffman*, 434 P.2d at 357 (stating that "[h]ad petitioners in any way interfered with the conduct of the railroad business, they could legiti-

includes an "interest in controlling litter and traffic," *Savage v. Trammel Crow Co., Inc.*, 273 Cal. Rptr. 302, 307 (Ct. App. 1990), and consideration of "whether the number and/or size of signs, posters or placards will interfere with and/or directly compete with business displays or logos." *H-CHH Assocs v. Citizens for Representative Gov't*, 238 Cal. Rptr. 841, 856 (Ct. App. 1987) ("*H-CHH*") *disapproved on other grounds by Fashion Valley Mall*, 172 P.3d at 754 n.12. Under California law, "the requirement of narrow tailoring is satisfied 'so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.' " *Savage*, 273 Cal. Rptr. at 307 (quoting *Albertini*, 472 U.S. at 689).

In this case, restricting the union members from wearing signs or carrying pickets promotes Macerich's substantial interest in making sure that protesters do not block access to stores or the sight-lines for store displays or impede foot traffic. That interest "would be achieved less effectively absent the regulation." *Id*. As already noted, California courts have stated that commercial property owners may "consider[ ] whether the number and/or size of signs, posters or placards will interfere with and/or directly compete with business displays or logos." *H-CHH Assocs*, 238 Cal. Rptr. at 856.

The majority concludes that the ban on wearing or carrying signs does not leave open ample alternatives for communication, speculating about the adequacy of various alternatives including Macerich's allowance of two signs attached to a table. The Supreme Court, however, requires us to give defer-

---

mately have been asked to leave"; *Slauson P'ship v. Ochoa*, 5 Cal. Rptr. 3d 668, 686 (Ct. App. 2003) (stating "our analysis starts with the fact that because the Mall is private property, Slauson did have the right to exclude persons from entering the Mall, and persons who entered the property without its permission were trespassing."); *Albertson's, Inc. v. Young*, 131 Cal. Rptr. 2d 721, 738 (Ct. App. 2003) (noting failure to comply with rules triggers the owner's right to stop the activity).

ence to reasonable determinations that substantial interests are best served by the restriction at issue. *See Ward*, 491 U.S. at 799 ("The Court of Appeals erred in failing to defer to the city's reasonable determination that its interest in controlling volume would be best served by requiring bandshell performers to utilize the city's sound technician.").**3** In fact, the Court has stated that the "less restrictive-alternative analysis has never been part of the inquiry into the validity of a time, place, and manner regulation." *Ward*, 491 U.S. at 787 (internal quotations and citations omitted). The Court went on to conclude that it is error to "sift[ ] through all the available or imagined alternative means of regulating [activity] in order to determine whether the city's solution was 'the least intrusive means' of achieving the desired end."**4** *Id.*

The proper analysis is whether Macerich's rules "foreclose an entire medium of public expression across the landscape of a particular community or setting." *Menotti v. City of Seattle*,

---

**3**Indeed, the Supreme Court has repeatedly admonished lower courts not to use the "ample alternative channels" requirement as a means of overturning regulations. *See Ward*, 491 U.S. at 799 (reversing because "[t]he alternative regulatory methods hypothesized by the Court of Appeals reflect nothing more than a disagreement with the city over how much control of volume is appropriate or how that level of control is to be achieved"); *Albertini*, 472 U.S. at 689 ("The validity of [time, place, or manner] regulations does not turn on a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests"); *Clark*, 468 U.S. at 299 ("The Court of Appeals' suggestions . . . represent no more than a disagreement with the Park Service over how much protection the core parks require or how an acceptable level of preservation is to be attained. We do not believe, however, that either *United States v. O'Brien* or the time, place, or manner decisions assign to the judiciary the authority to replace the Park Service as the manager of the Nation's parks or endow the judiciary with the competence to judge how much protection of park lands is wise and how that level of conservation is to be attained.").

**4**To the extent that the majority analyzes "numerous and less burdensome alternatives" to Macerich's regulations to conclude they were not narrowly tailored, this is an improper least-restrictive means analysis. *See Ward*, 491 U.S. at 787.

409 F.3d 1113, 1138 (9th Cir. 2005) (quotations omitted). "In the 'ample alternatives' context, the Supreme Court has made clear that the First Amendment requires only that the government refrain from denying a 'reasonable opportunity' for communication." *Id.* at 1141 (citing *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 54 (1986)). Foreclosing one narrow form of expression while allowing "myriad and diverse" alternatives for reaching the intended audience does not violate the First Amendment. *One World One Family Now v. City & Cty of Honolulu*, 76 F.3d 1009, 1014 (9th Cir. 1996).

The majority assumes that picketing includes the right to wear or carry signs. The Board, however, has noted that "picketing does not require the holding of a sign." *Laborers Int'l Union of N. Am.*, 287 NLRB 570, 573 (1987) (citing *United Mine Workers of Am., District 12*, 177 NLRB 213, 218 (1969)). I cannot find any authority that defines picketing to necessarily include the carrying or wearing of signs. *See Frisby*, 487 U.S. at 483 (noting ordinance stated that pickets "need not be carrying a sign"). Macerich's rule forbidding the wearing or carrying of signs did not ban "picketing."[5] Indeed, I conclude that Macerich's rule foreclosed only one method of "picketing" and did not categorically deny the unions of their ability to express their dissatisfaction with the use of non-union labor.

Macerich's rules left open ample alternative means for the unions to communicate their message to the mall patrons. The

---

[5]There is no absolute right to picket. *See Frisby*, 487 U.S. at 486-87 (noting that picketing can be offensive and intrusive). The passage from the California Supreme Court's decision in *Fashion Valley Mall* cited in support of a broader picketing right concerned content-based restrictions on picketing activity, not a content-neutral restriction. *See Fashion Valley Mall*, 172 P.3d at 748 (discussing *Diamond v. Bland*, 477 P.2d 733, 741 (Cal. 1970), which invalidated a rule that "all activity apart from regulated, mutually beneficial business promotions and displays, whether by tenants or strangers, is forbidden on the premises of the Center").

union could have used a table with two signs staffed by members, and Macerich's rules allowed union members to carry clipboards and leaflets with additional information for mall patrons. The majority mentions that Local 586 representatives went to Arden Fair Mall wearing shirts that said "Do Not Patronize Arden Fair Mall — Unfair to Carpenters," but fails to note that there is no evidence that Arden Fair Mall ejected the union representatives for wearing those shirts. Union members were free to wear or carry signs on the public sidewalks surrounding the malls' parking lots. The union had "myriad and diverse" alternatives for communicating their messages to mall patrons.

As the majority acknowledges, under California law, "the adequacy of alternative channels is not measured by the fondest hopes of those who wish to disseminate ideas." *Savage*, 273 Cal. Rptr. at 308 (citing *Clark*, 468 U.S. at 295). Although no California case has expressly approved of a rule banning the wearing or carrying of signs, an intermediate court has noted that commercial establishments are free to establish restrictions on the size and number of signs, placards, and posters. *H-CHH Assocs*, 238 Cal. Rptr. at 856. Thus, the California cases indicate that the California Supreme Court would uphold a commercial property owner's right to ban the wearing or carrying signs, placards, or posters as narrowly tailored and leaving ample alternative channels for communication and deny the petition. *See Calkins*, 187 F.3d at 1089 (discussing how to interpret state law).

C.   The designated areas rule and the peak days restriction have been expressly approved by California courts.

In *In re Hoffman*, 434 P.2d at 358, the California Supreme Court stated:

> Reasonable and objective limitations can be placed on the number of persons who can be present for First Amendment activities at the same time, and the

persons present can be required so to place them-
selves as to limit disruption. In areas normally sub-
ject to congestion, such as ticket windows and
turnstiles, First Amendment activities can be prohib-
ited. Persons can be excluded entirely from areas
where their presence would threaten personal danger
or block the flow of passenger or carrier traffic, such
as doorways and loading areas.

In *Union of Needletrades, Indus. & Textile Employees v.
Superior Court*, 65 Cal. Rptr. 2d 838, 847 (Ct. App. 1997)
("*UNITE*"), a California Court of Appeal held that "a shop-
ping center is constitutionally empowered to enact a rule lim-
iting expressive activities to a particular area." The union
wanted to distribute leaflets outside of Guess?, Inc. stores
located in six different malls instead of in the designated areas
provided by the shopping centers. *Id*. at 847-48. The state
appellate court rejected the union's "most effective point of
persuasion" argument, concluding that the California
Supreme Court's decision in *Pruneyard*, 592 P.2d at 347,
approving of time, place, and manner restrictions "to assure
that these activities do not interfere with normal business
operations" allowed the restriction of nonemployee union pro-
testers to designated areas of the shopping center.[6] *UNITE*, 65
Cal. Rptr. 2d at 849. The state court concluded that "a center
can impose reasonable and objective limitations on the num-
ber of persons who can be present and those persons can be
required to be in an area so as to limit disruption." *Id*. at 848.
As a result, the state appellate court held that several rules,
including rules restricting petitioning activity to two desig-

---

[6]Although under the First Amendment the nature of the message may
create a stronger interest in the symbolic location of the activity and the
ability to reach a specific audience, *see Galvin v. Hay*, 374 F.3d 739, 747-
52 (9th Cir. 2004), California has not given additional protection to sym-
bolic locations or more specific audiences (as opposed to mall patrons in
general) to expressive activity on private commercial property. *See
UNITE*, 65 Cal. Rptr. 2d at 849 n.4 (rejecting the most effective point of
persuasion argument).

nated areas in the malls, were valid time, place, and manner restrictions under California law. *Id.* at 848-49.

This case is no different, and if the restriction of petitioning activity to two designated areas is acceptable under California law, the NLRB must follow California law.[7] *Lechmere*, 502 U.S. at 538. California courts have balanced the expressive rights of unions under the California Constitution against property owners' rights under state property law. This is a question of state law that we are not free to reject. *West v. AT&T*, 311 U.S. 223, 236 (1940) ("[T]he highest court of the state is the final arbiter of what is state law. When it has spoken, its pronouncement is to be accepted by federal courts as defining state law. . . ."); *see also Calkins*, 187 F.3d at 1095 (noting that if California provides additional protection, it does so by modifying state property law).

The majority's reliance on the unavailability of the side-walks and entrances immediately outside the stores to conclude that Macerich's restrictions are not narrowly tailored is also not supported by California law. *See Lushbaugh v. Home Depot U.S.A.*, 113 Cal. Rptr. 2d 700, 707 (Ct. App. 2001) (noting designated areas may be located away from motorized traffic, foot traffic, and entrances).[8] Furthermore, California courts have concluded that the additional protection of speech in shopping malls under state law does not include a right to conduct activity at the most effective point of persuasion. *UNITE*, 65 Cal. Rptr. at 849 n.4 (collecting cases). The Board properly relied on *UNITE* in its decision; therefore, the

---

[7]To the extent the majority once again engages in an analysis of potential alternative regulations and relies upon the existence of less restrictive means to invalidate the restriction, their reasoning is improper under Supreme Court precedent. *See Ward*, 491 U.S. at 787; *Albertini*, 472 U.S. at 689.

[8]The California appellate court in *Lushbaugh* specifically cited to *Xiloj-Itzep v. City of Agoura Hills*, 29 Cal. Rptr. 2d 879, 889-90 (Ct. App. 1994), which applied the narrowly tailored test in upholding a ban on vehicle-addressed solicitation.

Board's decision is "rational and consistent" with California law.[9] *Calkins*, 187 F.3d at 1085.

Similarly, California courts have upheld so-called "peak days" restrictions in *H-CHH*, 238 Cal. Rptr. at 858 (approving of ban on heavy traffic days if the dates are set forth in writing); *UNITE*, 65 Cal. Rptr. 2d at 850 (approving of "holiday blackout periods" ranging from 25 specific days to the period between the weekend before Thanksgiving through January 2 of the next year); and *Costco Cos., Inc. v. Don Gallant*, 117 Cal. Rptr. 2d 344, 353-54 (Ct. App. 2002) (affirming restrictions on expressive activity on 34 busiest days). Indeed, Macerich's rule restricting expressive activity on 30 peak business days, accompanied by the list of unavailable dates, is more lenient than the restriction approved by the state court in *Costco Cos, Inc.* by four (4) days. In *UNITE*, the state appellate court approved restrictions on expressive activity spanning between the weekend before Thanksgiving through January 2nd, a period of forty-two (42) days. Accordingly, the Supreme Court's opinion in *Lechmere*, 502 U.S. at 535, as well as our own precedents, mandate that we accept state law and uphold the Board's determination that Macerich's peak days limitations are a valid time, place, and manner regulations.

The majority attempts to distinguish the California cases by stating that they do not discuss whether the rules are narrowly tailored. Both *UNITE* and *H-CHH* contain numerous citations to *In re Hoffman*, *Savage*, and other California cases specifically applying intermediate scrutiny to time, place, and man-

---

[9]The majority states that Macerich did not show that the demonstration violated a fire code. The Board specifically found that the designated area rule "assists the Respondent with complying with local fire codes." The malls introduced evidence that local fire codes required eight to ten foot clearances around entrances, and that the sidewalks were not sufficiently large to accommodate those clearances. I am unable to locate any authority requiring that Macerich establish a fire code violation before the fire code can be a substantial interest under the narrowly tailored test.

ner restrictions. In fact, *UNITE* specifically refers to other portions of the days limitations under a "content neutral" analysis as being "narrowly drawn" and then approves the blackout periods as "[e]qually appropriate" under California law. *UNITE*, 65 Cal. Rptr. 2d at 850. It is clear that the California courts in *UNITE* and *H-CHH* were applying intermediate scrutiny to content-neutral restrictions. We are not free to ignore clear state law precedents simply because their analysis was not as explicit as we would like. Even if *UNITE* and *H-CHH* fail to discuss intermediate scrutiny with sufficient clarity, the majority completely ignores the state court's analysis in *Costco* that:

> Costco's regulation is narrowly tailored because it protects Costco's substantial interests in the smooth operation of its stores on those days, which represent less than 10 percent of a calendar year, when those legitimate interests are most vulnerable to the disruption which expressive activity has from time to time engendered at Costco's stores. Because the 34-day ban is content neutral and leaves more than 300 other days during the calendar year in which expressive activity is permitted, it satisfies the remaining requirements of a valid regulation of time, place, and manner.

117 Cal. Rptr. 2d at 354.

We are bound by a state court's interpretation of state law when reviewing the NLRB's determination of whether there has been a violation of section 8(a)(1) of the NLRA when the NLRB must balance section 7 expressive rights against state property rights. *Thunder Basin Coal Co.*, 510 U.S. at 217 n.21; *Glendale Assocs*, 347 F.3d at 1152; *Calkins*, 187 F.3d at 1088. We may not substitute our interpretations of California law for that of the California courts of appeal. *See Hicks v. Feiock*, 485 U.S. 624, 629-30, 630 n.3 (1988) (noting state appellate court's determination of state law is binding and

must be given deference). "[O]nly state courts may authoritatively construe state statutes." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 577 (1996). "In the absence of convincing evidence that the state supreme court would decide differently, 'a federal court is obligated to follow the decisions of the state's intermediate courts.' " *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1494 n.4 (9th Cir. 1996) (quoting *In re Kirkland*, 915 F.2d 1236, 1239 (9th Cir. 1990)). The majority's opinion fails to give deference to state law, and appears to misuse the requirement of ample alternative channels to conduct a least-restrictive means analysis to invalidate content-neutral rules. In doing so, the majority disregards state cases approving the types of content-neutral restrictions Macerich imposed on expression for its malls, disapproves of the Board's proper reliance on state law, and attempts to create expressive rights under California law at the expense of state property rights.

Accordingly, I dissent.