[No. D035997. Fourth Dist., Div. One. Feb. 27, 2002.]

COSTCO COMPANIES, INC., Plaintiff, Cross-defendant and Appellant,
v.
DON GALLANT et al., Defendants, Cross-complainants and Appellants.

## COUNSEL

Morrison & Foerster, David F. McDowell and Roya P. Cohen for Plaintiff, Cross-defendant, and Appellant.

Law Offices of Peter D. Lepiscopo, Peter D. Lepiscopo; Gronemeier & Associates and Dale L. Gronemeier for Defendants, Cross-complainants and Appellants.

## OPINION

**BENKE, Acting P. J.**—At locations where it shares a parking lot with other retail businesses, the owner of a chain of retail warehouse stores permits expressive activity but only subject to regulations as to time, manner and place. In particular the storeowner prohibits all expressive activity on 34 days on which historically it has experienced a high volume of customer traffic. The owner also prevents any individual or organization from using its property for expressive activity on more than 5 days within any 30-day period (5/30 restriction(s)). The storeowner prohibits all expressive activity at its so-called stand-alone facilities.

The owner's restrictions on use of its premises are valid. Accordingly, we reverse that portion of the trial court's judgment which prevents the owner from enforcing its high-volume days and 5/30 restrictions at stores where it shares a parking lot with another retailer, and we affirm that portion of the trial court's judgment which permits the owner to prohibit all expressive activity at its stand-alone facilities.

### SUMMARY

Plaintiff, cross-defendant and appellant Costco Companies, Inc. (Costco), owns and operates a chain of 84 so-called big box warehouse-style retail stores in California and a total of 268 warehouse stores throughout the world. In the San Diego area Costco operates 10 stores. Six of the San Diego area stores are stand-alone facilities where Costco does not share a parking lot with any other commercial establishment.

Defendants, cross-complainants and respondents Don Gallant, Cecilia Gallant and Charity Gallant (collectively the Gallants) are actively engaged in the business of gathering voter signatures for initiatives and referenda and in registering voters for upcoming elections. The Gallants are retained by a broker who pays them between 25 cents and $2 per petition signature or registered voter. The amount they receive varies from issue to issue. According to the expert who testified on behalf of the Gallants, Costco stores are very fertile grounds for collecting petition signatures and registering voters because they have only one entrance and exit which all patrons must use. More traditional regional shopping centers are not nearly as productive for signature gathering because typically they have multiple points of ingress and egress.

Because it believed the activities of signature gatherers such as the Gallants were interfering with the operation of its business, in 1998 Costco substantially modified the circumstances under which it would permit expressive activity at its stores. As noted at the outset, at stores where it shares a parking lot Costco prohibited expressive activities on 34 of its busiest days and imposed the 5/30 limitation. In addition Costco does not permit any individual or group to use its facilities on consecutive weekends and restricts expressive activities to designated areas in front of its stores. Costco only allows three participants to engage in expressive activity at any one time and requires that they identify themselves. Costco requires that individuals or groups who want to use their stores complete an application at least three days in advance of any expressive activity. As we also noted Costco prohibits all expressive activity at its stand-alone stores.

After Costco imposed its new regulations, the Gallants attempted to comply with them. However, at two stores the Gallants and Costco employees were unable to resolve differences as to the meaning and validity of Costco's regulations.

Costco filed a complaint against the Gallants in which it sought declaratory and injunctive relief. The Gallants filed a cross-complaint in which they sought a judgment invalidating Costco's regulations and damages for a battery they believed occurred when Costco employees attempted to enforce the regulations.

After a lengthy trial the court found that with the exception of the 34 days in which no expressive activity was permitted and the 5/30 limitation, Costco's regulations were valid. With respect to Costco's prohibition on expressive activity on Costco's 34 busiest days, the trial court found that on any given day one to three petitioners would have only a minimal impact on Costco's business. The trial court found there was no basis for imposing the

5/30 limitation because "on any given day the typical Costco store will not have any expressive activity being conducted at its location." The trial court also found the 5/30 limitation provided Costco with too much discretion because Costco reserved the right to waive the restriction. Finally, the trial court found that a Costco employee did in fact batter one of the Gallants and awarded her $2,500 in damages.

Costco filed a timely appeal and the Gallants filed a timely cross-appeal.

## DISCUSSION

### I

### *Robins v. Pruneyard Jurisprudence*

At the heart of the parties' dispute is article I, section 2, subdivision (a) of the California Constitution which provides: "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press." In its groundbreaking decision in *Robins v. Pruneyard Shopping Center* (1979) 23 Cal.3d 899, 909-910 [153 Cal.Rptr. 854, 592 P.2d 341] (*Robins*), our Supreme Court held that, unlike the First Amendment of the United States Constitution, article I, section 2, subdivision (a) of the California Constitution may in certain circumstances restrain private property owners as well as governmental agencies. The court found that in the case of a large regional shopping center, "the public interest in peaceful speech outweighs the desire of property owners for control over their property." (*Robins*, at p. 909.) Quoting an earlier opinion, the court stated: " " '[T]he countervailing interest which [the owner] endeavors to vindicate emanates from the exclusive possession and enjoyment of private property. Because of the public character of the shopping center, however, the impairment of [the owner's] interest must be largely theoretical. [The owner] has fully opened his property to the public.' " " (*Id.* at p. 910.)

In recognizing the right of free expression extends in some instances to privately owned property, the court nonetheless expressly acknowledged private property owners, like governmental agencies, may regulate speech as to "time, place, and manner." (*Robins, supra,* 23 Cal.3d at p. 910.) The court stated: "By no means do we imply that those who wish to disseminate ideas have free rein." (*Ibid.*)

Since *Robins* was decided, Courts of Appeal have had the opportunity to more fully define the limits private property owners may place on the

expressive activity of visitors. In *Savage v. Trammell Crow Co.* (1990) 223 Cal.App.3d 1562, 1572 [273 Cal.Rptr. 302], we found that "[i]n giving private property owners the right to establish 'time, place and manner' rules, the court used the same formulation it had employed in describing the power government possesses with respect to public forums and the conduct of activities protected by the First Amendment." Thus although a citizen's "right to engage in expressive activity at shopping centers is found solely in the broader protection provided by California's Constitution, a shopping center's power to impose time, place, and manner restrictions on such activity is nonetheless measured by federal constitutional standards." (*Ibid.*) We noted that " 'even in a public forum the government may impose reasonable restrictions on the time, place or manner of protected speech, provided the restrictions "are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information." [Citations.]' " (*Id.* at p. 1573.)

With respect to the requirement that a regulation be narrowly tailored, we noted that courts must give some deference to the means chosen by a responsible decision maker. (*Savage v. Trammell Crow Co., supra,* 223 Cal.App.3d at p. 1574.) Quoting from the United States Supreme Court opinion in *Ward v. Rock Against Racism* (1989) 491 U.S. 781, 798 [109 S.Ct. 2746, 2757-2758, 105 L.Ed.2d 661], we stated: " 'Lest any confusion on the point remain, we reaffirm today that a regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate content-neutral interests but that it need not be the least-restrictive or least-intrusive means of doing so. Rather, the requirement of narrow tailoring is satisfied "so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." [Citations.] . . . . So long as the means chosen are not substantially broader than necessary to achieve the government's inter-est, however, the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative. "The validity of [time, place, or manner] regulations does not turn on a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting sig-nificant government interests" or the degree to which those interests should be promoted. [Citations.]' [Citations.]" (*Savage v. Trammell Crow Co., supra,* 223 Cal.App.3d at pp. 1574-1575.)

In addition to determining the nature of regulations a property owner may impose on the expressive activities protected by *Robins,* courts have also considered the question of what kinds of property are subject to article I,

section 2, subdivision (a) of our Constitution. *Allred v. Harris* (1993) 14 Cal.App.4th 1386, 1391 [18 Cal.Rptr.2d 530], *Planned Parenthood v. Wilson* (1991) 234 Cal.App.3d 1662, 1668 [286 Cal.Rptr. 427], and *Allred v. Shawley* (1991) 232 Cal.App.3d 1489, 1501-1502 [284 Cal.Rptr. 140], held that the private parking areas of medical facilities are not the equivalents of traditional public forums and that individuals do not have a constitutional right of access to them.

In *Trader Joe's Co. v. Progressive Campaigns, Inc.* (1999) 73 Cal.App.4th 425, 432-437 [86 Cal.Rptr.2d 442] (*Trader Joe's*), the court considered the circumstances under which the operator of a stand-alone food store was required to permit expressive activity on its premises. The court in *Trader Joe's* found that *Robins* does not require expressive activity at all privately owned facilities open to the public. Rather, under *Robins,* courts are required to consider the nature of the facility and weigh the competing interests of the public and the property owner. (*Id.* at p. 433.) Only when the public's interest in free expression outweighs the owner's interest in controlling access to property is expressive activity permitted. (*Ibid.*)

The *Trader Joe's* court found that the burden placed on large regional shopping centers by *Robins* was justified in large measure because they "were replacing central business districts as the favored forum for public congregation." (*Trader Joe's, supra,* 73 Cal.App.4th at p. 431.) In the case of the stand-alone retail outlet operated by the plaintiff, the court found that, although open to the public, the retail outlet was "not a public meeting place and society has no special interest in using it as such." (*Id.* at p. 433.) Thus the court found that "the [*Robins*] balancing test leads us to conclude that the societal interest in using the Santa Rosa Trader Joe's as a forum for exercising free speech and petitioning activities does not outweigh Trader Joe's interest in exercising exclusive control over the use of its private property." (*Id.* at p. 434.)

Quite recently the Supreme Court had occasion to again consider the right of private property owners to control speech on their property. In *Golden Gateway Center v. Golden Gateway Tenants Assn.* (2001) 26 Cal.4th 1013 [111 Cal.Rptr.2d 336, 29 P.3d 797] (*Golden Gateway*), the owner of a large residential apartment building adopted a regulation prohibiting door-to-door leafletting of its tenants. An association of residents challenged the validity of the regulation. Three justices of the court found that although not discussed in *Robins*, the rights enumerated in article I, section 2, subdivision (a)

of the California Constitution are only enforceable against the state. (*Golden Gateway*, at p. 1031.) The three-justice lead opinion further found that the requisite state action could be found in the activity of a private property owner "only if the property is freely and openly accessible to the public." (*Id.* at p. 1033.) Because the apartment building was not open to the public, the lead opinion concluded that no state action implicating rights protected by the Constitution had occurred. (*Id.* at p. 1034.)

In his opinion concurring in the result reached in the lead opinion, the Chief Justice found there was no need to determine whether article I, section 2 of the California Constitution was enforceable against private individuals and entities as well as the state. (*Golden Gateway, supra*, 26 Cal.4th at pp. 1035-1043 (conc. opn. of George, C. J.).) Rather, the Chief Justice found that even if article I, section 2 governs private individuals, "there is no state or federal constitutional right to *distribute unsolicited pamphlets* in a location (whether publicly or privately owned) not open to the general public, such as the closed interior hallways of the apartment buildings here at issue." (*Golden Gateway*, at p. 1040.)

Justice Werdegar, joined by Justice Kennard, and Justice Kline, sitting by designation, dissented. Justice Werdegar found that article I, section 2 of the California Constitution governs private individuals and that it requires a balancing of the competing interests of private property owners and the public interest in assuring the broad dissemination of information. (*Golden Gateway, supra*, 26 Cal.4th at pp. 1048-1049 (dis. opn. of Werdegar, J.).) In balancing those interests, Justice Werdegar found that the burdens on the landlord were not great and that the tenants' interest in communicating with each other about matters of common concern were substantial. (*Id.* at pp. 1052-1053 (dis. opn. of Werdegar, J.).)

## II

### Costco's Appeal

In its appeal Costco argues that its prohibition on expressive activities on its 34 busiest days and its 5/30 limitation are valid regulations as to time, manner and place. For the most part we agree with Costco.

### A. Interference with Commercial Use

The rights created in *Robins* and even the rights the dissenters in *Golden Gateway* would recognize were predicated on factual records which demonstrated the expressive activity under review had very little, if any, impact on

the property owner's operations. In *Robins* the court described the appellants as "high school students who attempted one Saturday afternoon to solicit support for their opposition to a United Nations resolution against 'Zionism.' They set up a cardtable in a corner of Pruneyard's center courtyard and sought to discuss their concerns with shoppers and to solicit signatures for a petition to be sent to the White House in Washington. *Their activity was peaceful and apparently well-received by Pruneyard patrons.*" (*Robins, supra,* 23 Cal.3d at p. 902, italics added.) In *Golden Gateway* the dissenting opinion noted: "While Golden Gateway's property managers testified in general terms to tenant concern about leafleting, the record reveals that Golden Gateway ultimately could document only one resident complaint about door-to-door leafleting in over 15 years." (*Golden Gateway, supra,* 26 Cal.4th at p. 1053, fn. 8 (dis. opn. of Werdegar, J.).)

Notwithstanding the expressive activities considered in *Robins* and *Golden Gateway,* litigants, such as the Gallants, have often ignored the very limited burden property owners, whether public or private, are required to endure in order to foster the public's interest in free expression. The fundamental limitation on the burden a property owner must suffer was set forth *In re Hoffman* (1967) 67 Cal.2d 845 [64 Cal.Rptr. 97, 434 P.2d 353], where a group of war protestors had been arrested while peacefully distributing leaflets in Union Station in Los Angeles. A municipal ordinance prohibited use of the station for any purpose other than a railway use. In finding that the ordinance was overbroad, the court held that under the First Amendment "the test is not whether petitioners' use of the station was a railway use *but whether it interfered with that use.* No interest of the city in the functioning of the station as a transportation terminal was infringed . . . . [¶] [The petitioners'] activities did not impede the movement of passengers or trains, distract or interfere with the railroad employees' conduct of their business, block access to ticket windows, transportation facilities or other business legitimately on the premises. *Petitioners were not noisy, they created no disturbance, and did not harass patrons who did not wish to hear what they had to say.*

"Had petitioners in any way interfered with the conduct of the railroad business, they could legitimately have been asked to leave. [Citations.] Similarly, *had petitioners' activities conflicted with any valid municipal interest, the municipality could have proceeded against them.*" (*In re Hoffman, supra,* 67 Cal.2d at pp. 851-852, italics added, fns. omitted.)

The "interference with purpose" standard set forth *In re Hoffman* was expressly relied upon by the court in *Robins* when it balanced the rights of the shopping center owner and petition gathers. (*Robins, supra,* 23 Cal.3d at

p. 909.) The court held: " 'A handful of additional orderly persons soliciting signatures and distributing handbills in connection therewith, under reasonable regulations adopted by defendant *to assure that these activities do not interfere with normal business operations* [citation] would not markedly dilute defendant's property rights.' [Citation.]" (*Id.* at p. 911.) In *H-CHH Associates v. Citizens for Representative Government* (1987) 193 Cal.App.3d 1193, 1208 [238 Cal.Rptr. 841], the court summarized this aspect of *Robins*: "In essence, *Robins* v. *Pruneyard Shopping Center, supra,* 23 Cal.3d 899, in affirming a shopping center owner's right to impose reasonable time, place and manner restrictions on petitioning activity, recognized in the owner important rights of substance; those rights are identified as freedom from disruption of normal business operations and freedom from interference with customer convenience."

■ Importantly, the reasonableness of a time, place or manner regulation—whether it was imposed by a government agency or a private property owner—depends on the relation the regulation bears to the overall problem the agency or property owner seeks to correct, not on the extent to which it furthers the agency or property owner's interest in an individual case. (*Ward v. Rock Against Racism, supra,* 491 U.S. at p. 801 [109 S.Ct. at p. 2759]; *Savage v. Trammell Crow Co., supra,* 223 Cal.App.3d at p. 1575.) "[A] regulation must be judged by considering all the groups who would have access to a particular forum and the regulation is valid so long as the property owner could reasonably have determined that its interests overall would be served less effectively without the regulation." (*Savage v. Trammell Crow Co., supra,* 223 Cal.App.3d at p. 1575.) As we explain in greater detail below, in the end it is this principle which the trial court ignored in finding that Costco's 34 high-volume day prohibition and its 5/30 limitation did not protect its substantial interests. The trial court's conclusions were based on what it thought was likely to happen on any given day, rather than upon consideration of the substantial problems which occurred at Costco's stores, albeit perhaps on an irregular and unpredictable basis.

### B. *Costco's Expenses, Burdens and Risks*

■ Unlike the property owners in *Robins, Golden Gateway* and *Hoffman,* Costco presented evidence that expressive activity at its stores has imposed upon it considerable expenses, administrative burdens and risks which directly impaired the commercial purposes of the stores.

In support of its regulation on expressive activity at the stores where it shares a parking lot, Costco presented testimony from one of its corporate attorneys. The attorney testified that in 1997 and 1998 Costco was experiencing a number of fairly serious problems with expressive groups using its premises to advance their respective views and causes.

One difficulty Costco experienced was complaints from its customers. According to Costco's corporate counsel, "members were complaining they were paying a fee, why did they have to be subjected to being annoyed, being interfered with, being approached by people that were petitioning. There were some complaints people were being followed by petitioners or that petitioners would not take no for an answer, would continue to pursue them to sign a petition or become involved in their cause." She testified: "We were having complaints from members that certain groups of people were at warehouses at all times and that Costco was being . . . why was Costco supporting their ideas?" The association of Costco with the views of petitioners reached a particular extreme when an initiative requiring that English be taught in public schools was being circulated: "I've had—during the English only petition, the Mayor of Chula Vista was actually organizing the counter efforts—or the former mayor he may have been—was the one organizing the counter efforts outside the initiative—outside the warehouse planning to boycott us."

The aggressive behavior of some petition gatherers led to still another difficulty for Costco: its employees had been verbally and physically abused by petition gatherers when they asked the petitioners to obey regulations with respect to noise and aggressive behavior toward customers. Costco employees "had been hit, slugged, by petitioners. They had petitioners throw things at them that could have caused some damage; you know, boards and things off the tables and chairs, and things had been thrown at them. . . . [¶] . . . [¶] I guess the average call, in fact, was more of the verbal abuse. They had been—when there'd been inciden[t]s where they had to speak to petitioners, had verbal abuse, had racial slurs thrown at them, insults to them that were offensive to them and they were concerned that as company policy where they were supposed to remain [courteous]."

Yet another problem Costco experienced was competition between various expressive groups and petition gatherers for the right to use a particular location. Costco's counsel explained: "Some locations had fax wars on the first of the month. Some of them had weekly groups of people who would apply to every location in a particular area and block them out every week, every week in a row, so they would be the first one there and in effect, they would be there 28 to 30 days out of the month, and a less organized group of people would not be able to get a request in fast enough to get to those dates and times, and that happened on a regular basis."

However, the most substantial problem Costco faced was the occurrence of altercations between the proponents and opponents of particular petition gathering efforts. "There were several inciden[t]s where groups would show

up without permits and some of them, someone would have a permit and there would just be kind of a demonstration going on. We've had demonstration from PETA who show up en masse and there would have been someone there with a permit for a totally different reason and they were in conflict of, why are these people here, and there's a big shouting match going on as to trying to draw attention to this protest of the people that didn't have a permit to be there.

"There were situations where there were, again, someone who ha[s] a permit that at the time was very divisive in a community and the counter group would want to be there to respond to that and if they couldn't get a permit on a separate day, they would show up anyway and have a shouting match going on in the front doors, basically; trying to out shout or stop people from going to the petitions."

According to Costco's counsel, these incidents were getting more serious over time. "There were concerns about . . . the escalation of behavior between the pro and counter groups that were just appearing on the property to, I guess, dispute the opposite side, the person with the permit. There were . . . serious safety concerns because we had had people who had been driving by with automatic rifles pointed at petitioners. [¶] There were two incidents in particular where people, someone was driving by the opening area with guns, with members complaining, with warehouse people complaining. . . . There was one incident there was a noise. . . . No one ever found a bullet, no one ever found anything, but there was a noise that shook up members and staff people."

As one might expect, the level of hostility generated by petition gatherers raised liability concerns for Costco. Indeed some petition gatherers asked Costco to provide protection for them. "There were petitioners who thought we were required to provide them with some kind of protection, some kind of—and we were supposed to be liable for anything that happened to them when they were on our property related to their speech."

The problems described by Costco's counsel clearly established that the expressive activities carried on by petition gatherers and others interfered with Costco's business operations. Costco suffered damage to its reputation among its customers, loss of time and morale among its employees and direct interference with conduct of its business on those occasions when conflicts arose between petition gatherers and those opposed to their views. The conflicts also exposed Costco to the risks of liability to its customers, employees and petition gatherers themselves. Given these circumstances, Costco had the right to impose regulations designed to protect its ability to

conduct its business operations. (*Robins, supra,* 23 Cal.3d at p. 911; *Savage v. Trammell Crow Co., supra,* 223 Cal.App.3d at p. 1575.)

C. *The 34 Heaviest Traffic Days*

Plainly, altercations between petition gatherers and their opponents posed the greatest threat to smooth operation of Costco's business on those days when Costco expected its highest volume of business. While an altercation on a low-volume day would no doubt be disruptive and potentially cause a loss of profits, Costco could reasonably conclude that the cost of disruption on a high-volume day would be substantially higher. Stated another way, Costco could rationally decide to diminish its overall risk by prohibiting expressive activities on the days when the risk to its profitably was highest.

In finding that on any given day petition gatherers would not substantially interfere with Costco's business, the trial court did not consider the nature of the problem Costco was attempting to address. While we accept the trial court's finding that on any given day ingress and egress was not likely to be hampered by three petitioners, Costco's interests were not limited to ingress and egress on any given day. Rather, Costco could be legitimately concerned with the impact on its business on those days when in fact a conflict between a group of petitioners and their opponents arose. There can be no dispute that when such conflicts arose, ingress and egress would be substantially impaired. In adopting its prohibition on expressive activities during its 34 highest volume days, Costco was acting well within its power to consider all the groups who would have access to all of its stores and its experience with all of those groups. (See *Savage v. Trammell Crow Co., supra,* 223 Cal.App.3d at p. 1575.)

In short, Costco's regulation is narrowly tailored because it protects Costco's substantial interests in the smooth operation of its stores on those days, which represent less than 10 percent of a calendar year, when those legitimate interests are most vulnerable to the disruption which expressive activity has from time to time engendered at Costco's stores. Because the 34-day ban is content neutral and leaves more than 300 other days during the calendar year in which expressive activity is permitted, it satisfies the remaining requirements of a valid regulation of time, place and manner. (*Savage v. Trammell Crow Co., supra,* 223 Cal.App.3d at p. 1575.)

D. *5/30 Restriction*

We have no quarrel with the trial court's finding that on any given day no expressive activity is going on at a typical Costco store. However, this

factual finding does not invalidate Costco's 5/30 limitation. The fact remains that at some of its stores Costco did experience monopolization of its property by certain petitioners and it was entitled to adopt uniform regulation addressing that problem. (See *Savage v. Trammell Crow Co., supra*, 223 Cal.App.3d at p. 1575.) Even where monopolization has not yet occurred, the 5/30 limitation plainly serves Costco's interest in dissociating itself from the views of petition gatherers and others who engage in expressive activities on its property. By also ensuring that competing viewpoints will have ample access to Costco's property, the rule no doubt diminishes the potential for conflicts between groups with opposing views. Again, the trial court's finding does not support its legal conclusion because it does not take into account the overall problem Costco was attempting to address and the monopolization it had experienced at some, but certainly not all, of its stores. (*Ibid.*)

Because the rule permits expressive activities at any Costco location in alternate months for up to five days, it provides adequate alternative access. The only defect in the 5/30 restriction is in the discretion it provides for waivers. As the trial court noted, where such discretion may be exercised without reference to objective standards, the regulation runs the risk of governing speech on the basis of its content. (See *H-CHH Associates v. Citizens for Representative Government, supra,* 193 Cal.App.3d at p. 1211.) Thus Costco may enforce its 5/30 restriction only if it does so on a uniform basis or on the basis of some objective standards which are content neutral.

## III

### *The Gallants' Cross-appeal*

The Gallants challenge that portion of the trial court's judgment which validates the prohibition on all expressive activities at its stand-alone stores. Like the court in *Trader Joe's*, we find that stand-alone stores, while popular and open to the public, are not public forums which require that their owners permit expressive activity.

In light of the Supreme Court's disposition in *Golden Gateway*, it is now clear expressive activity may be prohibited on private property where access to the property has been restricted. (*Golden Gateway, supra,* 26 Cal.4th at pp. 1034 (maj. opn. of Brown, J.), 1041 (conc. opn. of George C. J.).) However, even where private property, such as a stand-alone retail store, is open to the public, expressive activity may be prohibited. (*Trader Joe's, supra,* 73 Cal.App.4th at pp. 433-434.) "[*Robins*] establishes that there is a state constitutional right to exercise free speech and petitioning activity on private property. However, the [*Robins*] court did not purport to articulate

the precise scope of that right. It did not hold that the free speech and petitioning activity can be exercised only at large shopping centers. Nor did it hold that such activities can be exercised on any property except for individual residences and modest retail establishments. Rather, in resolving the specific dispute before it, the court developed a balancing test which can be applied to other situations. [*Robins*] instructs us to balance the competing interests of the property owner and of the society with respect to the particular property or type of property at issue to determine whether there is a state constitutional right to engage in the challenged activity." (*Id.* at p. 433, italics omitted.)

■ Here as in *Trader Joe's*, the public is invited to Costco's stores solely for the purpose of purchasing goods and services. Unlike the patrons of a large regional shopping center, Costco customers do not come to its stores with the expectation they will meet friends, be entertained, dine or congregate. While outlets such as Costco are popular, because of the narrow activity they offer—the purchase of goods and services offered by Costco—they are in no sense " 'miniature downtowns.' " (See *Robins, supra*, 23 Cal.3d at p. 910, fn. 5.) ■■■ Thus, unlike the shopping center considered in *Robins*, Costco's stand-alone stores are not essential or invaluable forums for the general exercise of free speech. (See *Robins, supra*, 23 Cal.3d at p. 910; *Trader Joe's, supra*, 73 Cal.App.4th at p. 434.)[1]

Costco also has a greater interest in maintaining control over its property than the operators of large shopping center. Unlike shopping center patrons or visitors to an urban downtown, the customers of a Costco stand-alone facility, which by design has only one entrance and one exit, have no practical means of avoiding encounters with petition gatherers and other participants in expressive activities. Thus, as the record here demonstrates, Costco runs a far greater risk of being identified with the views of those using its property than any individual tenant of a large shopping center.

Given the public's limited interest in using a stand-alone facility as a forum and Costco's heightened interest in controlling its property, the balance required under *Robins* falls decidedly in favor of Costco's right to restrict access to its property. (*Trader Joe's, supra*, 73 Cal.App.4th at p. 433.)

---

[1]Admittedly, where the property owner itself is the subject of a public dispute or controversy—as for instance a labor dispute—its property may as a practical matter be the only available forum to effectively express views on the controversy and it may be required to give its opponents access to its property. (See, e.g., *In re Lane* (1969) 71 Cal.2d 872, 876 [79 Cal.Rptr. 729, 457 P.2d 561]; *Sears, Roebuck & Co. v. San Diego County Dist. Council of Carpenters* (1979) 25 Cal.3d 317, 326-327 [158 Cal.Rptr. 370, 599 P.2d 676].) The Gallants however have never been advocates with respect to an issue in which Costco has any direct interest.

Thus we find no error in that portion of the trial court's judgment which upheld Costco's prohibition on expressive activity at its stand-alone stores.[2]

### DISPOSITION

The judgment is reversed as to Costco's 34-day prohibition on expressive activities and its 5/30 restriction and remanded with instructions to enter a judgment consistent with the views we have expressed; in all other respects the judgment is affirmed. Costco to recover its costs on appeal.

McDonald, J., and O'Rourke, J., concurred.

A petition for a rehearing was denied March 19, 2002, and the petition of appellants Don Gallant et al. for review by the Supreme Court was denied June 12, 2002. Kennard, J., was of the opinion that the petition should be granted.

---

[2]Costco asks that we extend the holding in *Trader Joe's* to those stores where it shares a parking lot with another retailer. Although Costco may be correct in arguing that there is no material difference between its stand-alone stores and the stores where it shares a parking lot with another retailer, it did not make this argument in the trial court and hence the Gallants were not given an opportunity to dispute it. Accordingly, we decline to consider this argument for the first time on appeal. (See *Jones v. Dutra Construction Co.* (1997) 57 Cal.App.4th 871, 876-877 [67 Cal.Rptr.2d 411].)