[No. B221067. Second Dist., Div. Two. Mar. 2, 2011.]

BEST FRIENDS ANIMAL SOCIETY, Plaintiff and Appellant, v. MACERICH WESTSIDE PAVILION PROPERTY LLC, Defendant and Respondent.

**COUNSEL**

Browne Woods George, Eric M. George and Ira Bibbero for Plaintiff and Appellant.

Katten Muchin Rosenman, Thomas J. Leanse, Stacey McKee Knight and Janella T. Gholian for Defendant and Respondent.

**OPINION**

**ASHMANN-GERST, J.**—The question presented is whether article I, section 2 of the California Constitution permits a privately owned shopping mall to

enforce rules that give preferential treatment to labor speech and thereby discriminate against other types of speech. The answer is no. We therefore reverse the trial court's order denying the motion for preliminary injunction filed by Best Friends Animal Society (Best Friends) against Macerich Westside Pavilion Property LLC (Macerich), the owner of the Westside Pavilion Shopping Center (Westside Pavilion).

FACTS

Westside Pavilion is a large shopping mall comprised of an original building and a new building. Macerich regulates the use of the common areas of Westside Pavilion with rules (WP Rules).

In particular, the WP Rules apply to noncommercial expressive activity such as political and religious speech, the request for signatures on petitions, the registration of voters and the dissemination of noncommercial leaflets or flyers. In addition, they apply to qualified labor activity, which is defined to mean "activity authorized by the National Labor Relations Act or applicable state labor laws that is conducted by: 1) an employee of a person or business engaged in work at [Westside Pavilion] who has a labor dispute with his or her employers; 2) a labor organization representing an employee of a person or business engaged in work at [Westside Pavilion] who has a labor dispute with his/her employer; 3) an individual attempting to organize employees of persons or businesses engaged in work at [Westside Pavilion]; and/or 4) a labor organization or a representative of a labor organization attempting to engage in picketing and/or informational leafleting (area standards and/or consumer activity) at [Westside Pavilion]."

The two types of expressive activity are regulated differently. Noncommercial expressive activity is limited to areas designated by the WP Rules; subject to Macerich's discretion, noncommercial expressive activity is not permitted on blackout days;[1] and noncommercial expressive activity must cease when the store nearest to the designated area is closed to the public. In contrast, qualified labor activity is permitted in either a designated area or an area selected by Macerich that is proximately located to the targeted employer or business; the blackout days do not apply to qualified labor activity of people employed at Westside Pavilion; and qualified labor activity related to the fixing of the terms or conditions of employment is permitted during the hours the targeted person or business is engaged in work at Westside Pavilion.

---

[1] The WP Rules identified the blackout days as February 14, May 9, June 20, October 31, November 14, November 21, November 27 through 29, and December 5 through 26.

In October 2008, a division of Best Friends known as Puppies Aren't Products: Los Angeles (PAPLA)[2] wrote to Macerich requesting permission to protest in front of Barkworks Pup & Stuff (Barkworks) every Saturday and Sunday. Barkworks is located near the entrance to Nordstrom on the third floor of the original building. According to Best Friends, Barkworks is guilty of selling puppies bred in inhumane "puppy mills."

Citing to the WP Rules, Macerich said that PAPLA would have to limit its activity to one of two designated areas, i.e., an area on the first floor of the original building or an area on a third level pedestrian bridge that connects the original building and the new building. Macerich further advised that PAPLA would not be permitted to protest on blackout days.

PAPLA began protesting in the designated area on the pedestrian bridge even though the location was not within aural or visual range of Barkworks. In the meantime, counsel for PAPLA objected to the WP Rules on the grounds that they discriminated between labor and nonlabor activity and were therefore unconstitutional under California law. Macerich defended the WP Rules, stating that the "discrimination between labor-related and non-labor-related petitioning activity is constitutional" and that a mall is otherwise permitted to limit petitioning activity to designated areas and days.

Macerich eventually offered PAPLA some additional locations. Best Friends did not consider them suitable. It sued Macerich for declaratory and injunctive relief based on the theory that the restrictions on free speech in the WP Rules violate article I, section 2 of the California Constitution. After initiating suit, Best Friends filed a motion for preliminary injunction to enjoin Macerich from enforcing the WP Rules to restrict PAPLA from protesting within aural and visual range of Barkworks or from protesting on blackout days. The motion was denied on the grounds that *Union of Needletrades, etc. Employees v. Superior Court* (1997) 56 Cal.App.4th 996 [65 Cal.Rptr.2d 838] (*UNITE*) permits a shopping mall to limit expressive activity to designated areas and days, and also that the National Labor Relations Act (29 U.S.C. § 151 et seq.) and state law compel Macerich to provide qualified labor activity with preferential treatment.

This timely appeal followed.

---

[2] At the time, PAPLA was known as Puppy Store Free L.A. For ease of reference, we simply refer to PAPLA.

## DISCUSSION

I. *Preliminary injunction law; standard of review.*

■ When ruling on a motion for preliminary injunction, "trial courts should evaluate two interrelated factors when deciding whether or not to issue a preliminary injunction. The first is the likelihood that the plaintiff will prevail on the merits at trial. The second is the interim harm that the plaintiff is likely to sustain if the injunction were denied as compared to the harm that the defendant is likely to suffer if the preliminary injunction were issued. [Citations.]" (*IT Corp. v. County of Imperial* (1983) 35 Cal.3d 63, 69–70 [196 Cal.Rptr. 715, 672 P.2d 121]; accord, *White v. Davis* (2003) 30 Cal.4th 528, 554 [133 Cal.Rptr.2d 648, 68 P.3d 74].) The trial court's evaluation and weighing of the two interrelated factors is reviewed for an abuse of discretion. However, the resolution of factual disputes is reviewed under the substantial evidence rule and the resolution of legal issues is reviewed de novo. (*Huong Que, Inc. v. Luu* (2007) 150 Cal.App.4th 400, 408–409 [58 Cal.Rptr.3d 527].)

II. *In general, the right of free speech in California entitles a person or group to protest a business in a shopping mall within aural and visual range of that business with no blackout days.*

This appeals pivots upon the right of free speech within California. As a preliminary matter, we examine that right.

■ Article I, section 2, subdivision (a) of the state Constitution provides: "Every person may freely speak, write and publish his or her sentiments on all subjects . . . . A law may not restrain or abridge liberty of speech or press." This clause, known as the liberty of speech clause, "is broader and more protective than the free speech clause of the First Amendment. [Citations.]" (*Los Angeles Alliance for Survival v. City of Los Angeles* (2000) 22 Cal.4th 352, 366–367 [93 Cal.Rptr.2d 1, 993 P.2d 334] (*Alliance*); see *Robins v. Pruneyard Shopping Center* (1979) 23 Cal.3d 899, 908 [153 Cal.Rptr. 854, 592 P.2d 341] (*Pruneyard*).) Even though the First Amendment does not protect the right to free speech in a privately owned shopping mall, the California Constitution does. (*Pruneyard*, at p. 910; *Fashion Valley Mall, LLC v. National Labor Relations Bd.* (2007) 42 Cal.4th 850, 862 [69 Cal.Rptr.3d 288, 172 P.3d 742] (*Fashion Valley*).) Thus, "[a] shopping mall is a public forum in which persons may reasonably exercise their right of free speech guaranteed by . . . the California Constitution." (*Fashion Valley, supra,* at pp. 869–870.) "Shopping malls may enact and enforce reasonable regulations of the time, place and manner of such free expression to assure that these activities do not interfere with the normal business operations of the

mall, but they may not prohibit certain types of speech based upon its content, such as prohibiting speech that urges a boycott of one or more of the stores in the mall." (*Id.* at p. 870; see *Pruneyard, supra*, 23 Cal.3d at p. 911.) According to our Supreme Court, "[u]rging customers to boycott a store lies at the core of the right to free speech." (*Fashion Valley, supra*, at p. 869.)

■ When analyzing time, place and manner restrictions, we may utilize California law as well as " 'federal constitutional standards.' [Citation.]" (*Alliance, supra*, 22 Cal.4th at p. 364, fn. 7; see *Snatchko v. Westfield LLC* (2010) 187 Cal.App.4th 469, 481 [114 Cal.Rptr.3d 368] (*Snatchko*) ["[w]e may consider federal First Amendment as well as California jurisprudence to analyze" whether the regulations of a mall "are content-neutral or content-based"].) If a speech restriction is a content-neutral regulation of time, place, or manner, it is subject to intermediate scrutiny to determine if it is narrowly tailored, serves a significant government interest, and leaves open ample alternative avenues of communication. If the restriction is content based, it is subject to strict scrutiny to determine whether it is narrowly drawn and necessary to serve a compelling interest. (*Fashion Valley, supra*, 42 Cal.4th at pp. 865, 869.) However, when determining whether a regulation is narrowly drawn, courts must give some deference to the means chosen by responsible decision makers. (*International Society for Krishna Consciousness of California, Inc. v. City of Los Angeles* (2010) 48 Cal.4th 446, 458 [106 Cal.Rptr.3d 834, 227 P.3d 395].) A regulation need not be the least restrictive or intrusive means of accomplishing a significant or compelling interest as long as it is not substantially broader than necessary. (*Ibid.*; *Keenan v. Superior Court* (2002) 27 Cal.4th 413, 430 [117 Cal.Rptr.2d 1, 40 P.3d 718].)

A. *Place restrictions: designated areas.*

1. *Federal law.*

■ In general, federal cases establish that people engaged in free speech must be given sufficient access to their intended audience. (*Students Against Apartheid Coalition v. O'Neil* (W.D.Va. 1987) 660 F.Supp. 333, 339 [holding that a university could not prohibit student protesters from building shanties in front of a target building in order to reach their intended audience; rejecting the university's argument that there were ample alternative means of communication because the students could build the shanties "beyond earshot or clear sight" of the target building]; *U.S. v. Baugh* (9th Cir. 1999) 187 F.3d 1037, 1044 [holding that it was unconstitutional for park service to limit protesters to an area 150 to 175 yards away from a visitor's center that housed the intended audience because such "distancing of the demonstrators from the intended audience does not provide a reasonable alternative means for communication of [the protesters'] views"]; *Kuba v. 1-A Agricultural Assn.*

(9th Cir. 2004) 387 F.3d 850, 863 [holding that it was unconstitutional for a governmental entity to cordon an animal rights protester off in a free expression zone the size of a parking space that was located over 200 feet from the entrance of the targeted circuses and rodeos].) Indeed, the First Amendment "protects the right of every citizen to 'reach the minds of willing listeners and to do so there must be [an] opportunity to win their attention.' " (*Heffron v. Int'l Soc. for Krishna Consc.* (1981) 452 U.S. 640, 655 [69 L.Ed.2d 298, 101 S.Ct. 2559].) "Accordingly, when a state body provides a citizen with an alternative forum for expression it should open up a forum that is accessible and where the intended audience is expected to pass. [Citation.]" (*Students Against Apartheid Coalition v. O'Neil, supra,* 660 F.Supp. at p. 339.)

As explained in *Bay Area Peace Navy v. U.S.* (9th Cir. 1990) 914 F.2d 1224, 1229 (*Peace Navy*), speculative reasons for denying protesters access to their intended audience do not suffice. At issue in *Peace Navy* was a security zone imposed by the Coast Guard during a parade of Navy ships that prevented protesters from bringing their boats within 75 yards of a reviewing stand where military officers, local government officials and other dignitaries were seated. The question was whether the security zone was narrowly tailored to preserve marine safety and protect public and naval officials from attack. The court concluded that the security zone burdened more free speech than required in the name of safety because there was no evidence of known terrorist threats or of mishaps involving boats in the area. (*Id.* at p. 1228.) Other than communicating from their boats, the protesters had no ample alternative to convey their message to the intended audience. (*Id.* at p. 1229.) The court affirmed an injunction enjoining the government from enforcing the security zone absent new evidence of safety or security threats. (*Id.* at p. 1231.)

█ *Service Employees Internat. Union v. City of Los Angeles* (C.D.Cal. 2000) 114 F.Supp.2d 966 (*Service Employees*) is consistent with *Peace Navy*. In *Service Employees*, the City of Los Angeles designated a secure zone of over 8 million square feet around the Staples Center prior to the 2000 Democratic National Convention. The city planned to implement the secure zone three days before the convention and establish an official demonstration site that was 260 yards away from the Staples Center. A labor group and a number of political groups and activists argued that the secure zone violated their First Amendment rights to engage in free speech. The court held that the secure zone was unconstitutional to the degree that it excluded persons from the area to the north and east of Staples Center where delegates and attendees

would enter and leave the facility.[3] Though the city stated that the secure zone was necessary for public safety, the court explained that "[e]ven when public safety is at stake, the government must choose a narrowly tailored response. [Citation.]" (*Service Employees*, at p. 971.) Moreover, the "government cannot infringe on First Amendment rights on the mere speculation that violence *may* occur. [Citations.]" (*Ibid.*) Otherwise, government restrictions on free speech in public areas would become essentially unreviewable. (*Ibid.*) The generally accepted way to deal with " 'unlawful conduct that may be intertwined with First Amendment activity is to punish it after it occurs, rather than to prevent [it] from occurring in order to obviate the possible unlawful conduct. [Citations.]' " (*Ibid.*, quoting *Collins v. Jordan* (9th Cir. 1997) 110 F.3d 1363, 1373.)

### 2. *The evolution of California law.*

The law regarding limitations on free speech to designated areas in malls has been considered in *H-CHH Associates v. Citizens for Representative Government* (1987) 193 Cal.App.3d 1193 [238 Cal.Rptr. 841] (*H-CHH*), *UNITE* and *Snatchko*. As we explain below, *UNITE* cuts against the weight of authority, and we opt to follow *H-CHH* and *Snatchko* with respect to the validity of designated areas.

■ *H-CHH* invalidated an unwritten rule that either restricted expressive activity to a certain area or gave mall management unbounded discretion to determine where expressive activity could take place. (*H-CHH, supra*, 193 Cal.App.3d at p. 1213.) The court explained that "[a] regulating authority may not adopt rules which preclude the exercise of free expression in an appropriate place, even on the ground another place is available. [Citations.]" (*Ibid.*, disapproved on other grounds in *Fashion Valley, supra*, 42 Cal.4th at p. 869, fn. 12.)[4] And, absent definite, objective written criteria for providing

---

[3] In analyzing the specifics of the secure zone, the court stated that "[w]hile defendants claim that there is a 'sight line' from the Demonstration Area to the Staples Center, the distance ensures that only those delegates with the sharpest eyesight and most acute hearing have any chance of getting the message, that is, assuming that the 'sight line' is not blocked during the convention. This is a questionable assumption because it does not account for the fact that, between the Staples Center entrance and the Demonstration Area, there will be a 'media village' housing 10,000 members of the media with their equipment (such as staging facilities and a large screen TV). . . . Thus, it is likely that the delegates will not be able to see or hear messages conveyed in the 'Official Demonstration' area. In short, at this crucial political event, those who do not possess a ticket to the convention cannot get close enough to the facility to be seen or heard. The First Amendment does not permit such a result." (*Service Employees, supra*, 114 F.Supp.2d at p. 972, citations omitted.)

[4] *H-CHH* upheld a ban on soliciting political funds. (*H-CHH, supra*, 193 Cal.App.3d at p. 1221.) *Fashion Valley* stated that although "solicitations for immediate donations may be restricted based upon 'the inherently intrusive and potentially coercive nature of that *kind* of speech' [citation], the decision in *H-CHH* was incorrect that solicitations of funds may be

or refusing a location for free speech, a regulation is constitutionally invalid. (*H-CHH, supra,* at p. 1213.)

In 1997, *UNITE* was decided. It involved a dispute over the wages and working conditions of those who manufactured apparel for a company that sold clothes, inter alia, in shopping malls. A union sought to place four individuals in front of stores in six shopping malls to picket and distribute leaflets, including Westside Pavilion. The shopping malls cited their designated area rules and denied the requests. (*UNITE, supra,* 56 Cal.App.4th at pp. 1009–1012.) On appeal, the court found the rules valid. It is the only case to hold that "a shopping center is constitutionally empowered to enact a rule limiting expressive activities to a particular area." (*Id.* at p. 1010.) In doing so, it relied on a statement in *H-CHH* that *Pruneyard* "recognized in the owner important rights of substance; those rights are identified as freedom from disruption of normal business operations and freedom from interference with customer convenience." (*H-CHH, supra,* 193 Cal.App.3d at p. 1208; see *UNITE, supra,* at pp. 1009–1010.) *UNITE* did not discuss the holding in *H-CHH* regarding designated areas or analyze whether the designated area rules were narrowly tailored.

The most recent California case regarding free speech rights in malls is *Snatchko*. In *Snatchko*, the court analyzed rules that, inter alia, prohibited noncommercial expressive activity except for one-on-one communications taking place in designated areas. Private conversations between persons previously acquainted as well as activity sponsored by the mall or its tenants were exempt. As applied, the rules allowed strangers to converse about mall-related matters.[5] The plaintiff in the case was a youth pastor who was arrested for talking to three consenting mall patrons about his Christian faith. He did not solicit funds or distribute any literature. (*Snatchko, supra,* 187 Cal.App.4th at pp. 474–475, 484.) The criminal charges were dismissed. The plaintiff sued the mall for declaratory and injunctive relief and alleged that the mall's rules violated the California Constitution. (187 Cal.App.4th at p. 475.)

---

prohibited simply because they compete with [a] shopping center's merchants. Relying upon the fact that a solicitation of funds competes with the shopping center merchants . . . would lead to the conclusion that all solicitations of funds may be prohibited, even those that are not inherently intrusive or potentially coercive. Such a restriction would be too broad." (*Fashion Valley, supra,* 42 Cal.4th at pp. 868–869.) The court disapproved *H-CHH* "to the extent it states a contrary view." (*Id.* at p. 869, fn. 12.)

[5] The rules in *Snatchko* provided that " '[t]hese Rules are not intended to apply to activity sponsored by the [mall] and/or an enterprise(s) engaged in business at the [mall].' 'These Rules also are not intended to apply to private conversations between and among persons previously acquainted with one another.' " (*Snatchko, supra,* 187 Cal.App.4th at p. 477.) The introduction to the WP Rules employed by Macerich at Westside Pavilion contains identical language.

The mall claimed the regulations served significant interests in safety and the convenience of mall patrons. (*Snatchko, supra*, 187 Cal.App.4th at pp. 481–487.) The court disagreed. The regulations did not serve the mall's purported interest in safety because they allowed "unlimited numbers of previously acquainted individuals to congregate and converse in any location and unlimited numbers of strangers to congregate in any location and converse about topics related to the mall, its tenants or their sponsored activities." (*Id.* at p. 488.) Though the mall wanted to limit noncommercial expressive activity to designated areas so its patrons would not be disturbed and could easily choose to either enter or avoid those areas, the court found that "providing a 'stress-free shopping atmosphere' for patrons is not a compelling interest compared to the free speech rights of other individuals at the mall. Indeed, the California Supreme Court [in *Fashion Valley*] has already determined that a public forum shopping mall's business interest in ensuring its shopping customer's convenience and undisturbed comfort in order to prevent loss of customers and maximize profit is not a compelling interest justifying a content-based restriction of speech." (*Snatchko, supra*, at pp. 488–489, fn. omitted.) The court determined that the regulations were content based and did not pass strict scrutiny, and that even if they were content neutral they would not survive intermediate scrutiny. (*Id.* at pp. 481–487.) The designated area rules were invalidated in the broad sweep of the holding.

*H-CHH* and *Snatchko* are consistent with federal principles of free speech because they allow people engaged in expressive activity to access desired areas in shopping malls unless excluding them would pass the appropriate level of scrutiny. In contrast, *UNITE* is inconsistent with those federal principles because it would permit a shopping mall to limit expressive activity to designated areas regardless of the suitability of those areas or the suitability of other, more desirable areas. Accordingly, we opt not to follow the lead of *UNITE*.[6]

B.  *Time restrictions: blackout days at California businesses.*

Blackout days were considered by *UNITE, supra*, 56 Cal.App.4th at page 1014, *H-CHH*, *Costco Companies v. Gallant* (2002) 96 Cal.App.4th 740, 753 [117 Cal.Rptr.2d 344] (*Costco*) and *United Brotherhood of Carpenters Local 586 v. N.L.R.B.* (9th Cir. 2008) 540 F.3d 957 (*Carpenters*). Because

---

[6] The parties asked us to consider *Savage v. Trammel Crow Co.* (1990) 223 Cal.App.3d 1562 [273 Cal.Rptr. 302] (*Savage*). *Savage* held that a mall could ban leafleting in a parking lot to serve the significant interest of controlling litter and traffic. (*Savage, supra*, 223 Cal.App.3d at pp. 1574–1575.) The court determined that the ban was "especially appropriate in light of the fact [that the] policy does not prevent [leafleting] on [mall] sidewalks" and people were not prevented from reaching mall patrons. (*Id.* at p. 1575.) *Savage* is distinguishable because it excluded free speech from an area instead of limiting it to a designated area.

*Carpenters* offers a full analysis of the issue and the other cases do not, *Carpenters* is more persuasive.

*UNITE* upheld blackout days based on unspecified evidence that they were necessary. (*UNITE, supra*, 56 Cal.App.4th at p. 1014.) Prior to that, *H-CHH* approved a holiday ban on the theory that speech can be excluded from areas normally subject to congestion. Neither case analyzed whether the blackout days were narrowly tailored. *Costco* concluded that blackout days were narrowly tailored to protect a company's "substantial interests in the smooth operation of its stores" when its business interests were most vulnerable and there was a high risk of losing profits. (*Costco, supra*, 96 Cal.App.4th at p. 753.) That said, it must be recognized that *Costco* is different from the other cases. It involved petition gatherers seeking access to a store. There was evidence that customers were complaining about the petition gatherers, the petition gatherers verbally and physically abused store employees, various groups competed rigorously for the right to use a particular location, and there were escalating altercations between the proponents and opponents of petitions (including incidents of people driving by protesters with guns and automatic rifles), which raised liability concerns for the company. (*Id.* at pp. 750–752.) Thus, in *Costco*, there was evidence that the petitioning activity interfered with business operations and the blackout days were aimed at actual rather than speculative harm.

In the absence of a narrow tailoring analysis, *UNITE* and *H-CHH* are dubious authority regarding the validity of blackout days. We also have concerns about the analysis in *Costco*. Though *Costco* concluded that the blackout days were narrowly tailored, it considered the restriction in a vacuum. In other words, it concluded that the blackout days were narrowly tailored because they represented less than 10 percent of the calendar year. The court did not consider whether the restriction was overbroad because it barred nondisruptive speech as well as disruptive speech. Nor did it consider that people engaged in free speech would likely convey their message to a proportionally larger audience on a blackout day compared to any other day. In addition, the court did not examine whether the store could have achieved its interest in smooth operation through the use of restrictions rather than a blanket ban. (*Costco, supra*, 96 Cal.App.4th at p. 753.) Beyond these points, it cannot be escaped that *Costco* cited the company's interest in maximizing profit as a significant business interest, but *Fashion Valley* subsequently held that a mall's "purpose to maximize the profits of its merchants is not compelling compared to the [public's] right to free expression." (*Fashion Valley, supra*, 42 Cal.4th at p. 869.) The continuing precedential value of *Costco* is therefore unclear, and we believe that it should be limited to its facts. For a more comprehensive analysis, we must turn to *Carpenters*.

In *Carpenters*, a mall imposed a ban on expressive activities during blackout days. The mall was managed by what we are told is an affiliate of Macerich. The court stated: "A complete ban on expressive activities is narrowly tailored only where 'each activity within the proscription's scope is an appropriately targeted evil.' [Citation.] Macerich has failed to explain how banning every expressive activity during peak times advances a significant interest. Instead, Macerich attempted to justify the entire ban as a 'common sense' measure to decrease crowding during peak times. Numerous less restrictive alternatives would promote the same interest, including a limit on the number of individuals engaged in expressive activities at any one time. Although a regulation need not be the least restrictive method of advancing a compelling interest, . . . the complete ban at issue here is certainly over-broad." (*Carpenters, supra,* 540 F.3d at p. 972, fn. & citation omitted.) The court declined to follow *H-CHH* and *UNITE* because neither case "explicitly addressed whether the regulations in question were narrowly tailored." (*Carpenters, supra,* 540 F.3d at p. 972, fn. 14.) And it distinguished *Costco* because it involved evidence that petition gatherers "had directly interfered in the store's business, and imposed considerable expenses, administrative burdens, and risks. [Citation.]" (*Ibid.*) According to the court, the "complete ban on expressive activities, more than any of the other mall rules, fails to leave open ample alternatives for communication. . . . Macerich suggests the alternatives of media advertising, demonstrations on public property, and expressive activity in the Malls during the days of the year when such activity is not entirely prohibited. . . . [But] the options of media advertising and picketing on public property are neither effective nor economical. Limiting expressive activity to non-peak times eliminates the opportunity to comment upon or criticize—directly and in-person—tenants' actions during the time that they make 75% of their sales, and forecloses any chance of effectively reaching a large percentage of the target audience. For these reasons, the peak traffic rule is not a reasonable time, place, or manner restriction." (*Id.* at pp. 972–973.)

*Carpenters*, of course, is not binding on us. But we agree with *Carpenters* that a blanket ban is overbroad, at least in cases where there is no showing that other restrictions will not suffice.

C. *Conclusion.*

To sum up our survey of the law, it is a general proposition that a shopping mall must allow protests within aural and visual range of a targeted business whenever the mall is open to the public. A mall may not impose blanket bans on the time or place of free speech unless there is proof that blanket bans are the only way to prevent substantial disruption of normal business operations. Before imposing blanket bans on time and place, a mall

must consider achieving legitimate goals with lesser restrictions, e.g., limiting the number of people or organizations permitted to engage in speech or limiting the manner of speech.

III. *Best Friends is entitled to a preliminary injunction.*

A. *The WP Rules are content based to the degree that they distinguish between noncommercial expressive activity and qualified labor activity.*

██ The United States Supreme Court "has stated that a restriction is content neutral if it is 'justified without reference to the content of the regulated speech.' [Citations.]" (*Alliance, supra,* 22 Cal.4th at pp. 367–368.) On their face, the WP Rules regulate speech based on content, i.e., qualified labor activity is given greater reign at Westside Pavilion versus noncommercial expressive activity. Our conclusion is consistent with federal cases that examined and rejected regulations with comparable impact on free speech. In *Police Department of Chicago v. Mosley* (1972) 408 U.S. 92 [33 L.Ed.2d 212, 92 S.Ct. 2286], the court struck down a regulation that banned picketing or demonstrating within 150 feet of any primary or secondary school except for the peaceful picketing of any school involved in a labor dispute. (*Id.* at pp. 93–94.) The court explained that "[i]f peaceful labor picketing is permitted, there is no justification for prohibiting all nonlabor picketing, both peaceful and nonpeaceful." (*Id.* at p. 100.) In *Carey v. Brown* (1980) 447 U.S. 455 [65 L.Ed.2d 263, 100 S.Ct. 2286], the court held that a state statute was unconstitutional because it barred picketing of residences or dwellings, but exempted from its prohibition the peaceful picketing of a place of employment involved in a labor dispute. The court rejected the presupposition that labor picketing was more deserving of First Amendment protection than were public protests over other issues. (*Carey,* at p. 466.)

██ Macerich argues that even if the WP Rules are literally content based, they must be treated as content neutral because the distinction between qualified labor activity and noncommercial expressive activity is based on efforts to comply with labor law and not based on censorship or favoritism to any viewpoint. But Macerich did not cite any case law—federal or state—requiring it to discriminate against noncommercial expressive activity or grant greater free speech rights in public forums to qualified labor activity than other speech.[7] Also, Macerich's intent is not dispositive. "Specific illicit

---

[7] Both parties devoted a substantial portion of their briefs to discussing whether labor-related free speech has special rights in public forums not enjoyed by other free speech (even political speech). The cases cited by Macerich are so completely inapposite we decline to discuss them. We note that since oral argument, the Fifth Appellate District decided *Ralphs Grocery Co. v. United Food & Commercial Workers Union Local 8* (2011) 192 Cal.App.4th 200 [120

intent or motive is not the sine qua non of a violation of free speech. [Citations.]" (*Snatchko, supra*, 187 Cal.App.4th at p. 481.) The mere assertion of a content-neutral purpose is not enough to save a regulation " 'which, on its face, discriminates based on content. [Citations.]' [Citation.]" (*Ibid.*)

It is true, as Macerich points out, that case law does not always require literal content neutrality in time, place and manner restrictions. (*Alliance, supra*, 22 Cal.4th at p. 379.) In *Alliance*, for example, the court held that an ordinance that banned all aggressive solicitation for the immediate exchange of funds and all solicitation for immediate donations in certain captive audience areas "should be considered content neutral for purposes of article I, section 2[, subdivision] (a)" of the California Constitution. (*Alliance, supra*, 22 Cal.4th at p. 379.) The court noted that United States Supreme Court cases "that have addressed the question of content neutrality in the context of solicitation all have classified such laws as being content neutral, even though the laws at issue in those cases distinguished between speech that solicited the immediate donation of money and other protected speech, and thus were not totally unconcerned with the literal content of spoken or written words." (*Id.* at p. 368.) Such regulation is lawful so long as it "predominantly is addressed to the inherently intrusive and potentially coercive nature of that *kind* of speech, and not to the content of the speech. [Citation.]" (*Id.* at p. 373.) Another case in the same vein is *DVD Copy Control Assn., Inc. v. Bunner* (2003) 31 Cal.4th 864 [4 Cal.Rptr.3d 69, 75 P.3d 1] (*DVD Copy*). There, the trial court issued a preliminary injunction prohibiting a defendant from disclosing misappropriated trade secrets. In upholding the ruling, *DVD Copy* explained that "the injunction singled out [the defendant's] communications because of [the plaintiff's] efforts to maintain the secrecy of the [trade secrets] and the competitive advantage it enjoyed from those efforts—and not because of the communications' subject matter or any disagreement with [the defendant's] message or viewpoint. In other words, the trial court issued the injunction to protect [the plaintiff's] statutorily created property interest in

Cal.Rptr.3d 878] (*Ralphs*). The *Ralphs* court reviewed Code of Civil Procedure section 527.3, known as the Moscone Act, and Labor Code section 1138.1. The language of these two statutes restricted the ability of courts to enjoin picketing and other types of speech in cases involving labor disputes. Other speech did not receive the same protection. The court held: "We conclude the state may not act to selectively create a free speech right applicable only to the few, while excluding all others, in the absence of a compelling state interest. As a result, we hold that the Moscone Act and Labor Code section 1138.1 contravene the free speech provisions of California Constitution, article I, section 2, by discriminatorily conferring speech rights on some, but not all, Californians without a compelling state interest." (*Ralphs, supra*, at p. 208.) While we do not rely on *Ralphs*, we note that it supports our conclusion that California does not permit discrimination against nonlabor speech.

information—and not to suppress the content of [the defendant's] communications. Because the injunction is justified without reference to the content of [the defendant's] communications, it is content neutral." (*DVD Copy, supra,* at p. 878.)

Neither case helps Macerich. The WP Rules fall well outside of *Alliance* because they do not apply evenly to a kind of speech regardless of content. It is indisputable that they allow protests with labor messages in areas proximately located to targeted employers or businesses, but protests with nonlabor messages are not afforded the same right. And, simply put, there is no analogy between the WP Rules and the injunction in *DVD Copy* because the WP Rules are not justified by a statutorily created property interest in information.

We note that *Carpenters* supports our conclusion that the WP Rules are content based. That case involved the following rules in two shopping malls: (1) a ban on activities that identify by name the mall owner, manager, or tenants; (2) a ban on signage and written materials that interfere with the commercial purpose of the mall; (3) a ban on the carrying or wearing of signs; (4) an application process that requires the presubmission of written materials; (5) the exclusion of exterior areas, including mall sidewalks, from designated areas where expressive activities may occur; and (6) the prohibition of expressive activities during peak traffic days. (*Carpenters, supra,* 540 F.3d at pp. 960–961.) In analyzing whether the rules were content based, the court cited Ninth Circuit law establishing that "[s]peech-regulating rules are considered content-neutral when the rules are not related to the subject or topic of the speech. [Citation.] Rules are generally considered content-based when the regulating party must examine the speech to determine if it is acceptable. [Citation.]" (*Id.* at p. 964, fn. omitted.) The court applied the foregoing law and held: "[T]he identification ban is content-based because [the management company] would have to review the content of speech and literature to determine whether the speech violated the ban by naming a mall tenant, owner, or manager." (*Ibid.*) According to the court, the same analysis applied to the second rule. In addition, the application required by the fourth rule was content based insofar as it was used to enforce rules one and two. (*Id.* at pp. 966–967.) Only rules three, five and six were deemed content neutral. (*Id.* at pp. 967–972.) Using *Carpenters* as a guide, we are led inexorably to the one conclusion: the restrictions regarding the locations and dates of free speech are content based because they require Macerich to review the message to decide if it is allowed.

B. *The WP Rules do not pass strict scrutiny.*

A content-based regulation is presumptively invalid, and the proponent must prove that the regulation is lawful. (*Keenan v. Superior Court, supra*, 27 Cal.4th at p. 425; *Alliance, supra*, 22 Cal.4th at p. 385.)

Macerich argues that the WP Rules are necessary to serve the compelling interest of complying with federal and state law by allowing qualified labor activity within close proximity of a targeted employer.[8] In other words, Macerich suggests that the law compels it to discriminate. But federal and state laws do not require shopping malls to give labor speech more access to common areas than political and other types of free speech. Thus, the WP Rules do not pass strict scrutiny because they do not serve a compelling interest. Whether they are narrowly tailored to serve Macerich's stated interest is an issue we need not reach.

C. *The propriety of injunctive relief.*

Based on our constitutional analysis, we conclude that Best Friends demonstrated a likelihood of success on the merits at trial. Regarding the balancing of harms, we conclude that there is no need to delve into the matter beyond a few salient comments. First, the trial court found that Best Friends met its burden on this issue, and neither party has analyzed or asked us to revisit it. Second, cases "have repeatedly held that harms to speech rights ' "for even minimal periods of time, unquestionably constitute[] irreparable injury" ' supporting preliminary relief. [Citations.]" (*Scott v. Roberts* (11th Cir. 2010) 612 F.3d 1279, 1295.) Thus, Best Friends established that it was entitled to a preliminary injunction.

IV. *Injunctive relief will not result in a taking.*

Macerich argues that allowing PAPLA unrestricted access to Westside Pavilion to engage in expressive activity is an unconstitutional taking under the Fifth Amendment. This is a straw man argument. Our holding still permits Macerich to enforce time, place and manner restrictions as long as they are content neutral and pass intermediate scrutiny or are content based and pass

---

[8] In the introduction to its respondent's brief, Macerich states that the WP Rules "limit expressive activity to four designated areas, all of which are located in high-traffic areas that also avoid safety and fire hazards, as well as inconvenience to the [Westside Pavilion's] patrons." Macerich further states that prohibiting expressive activity on certain days "is critical to preserving patron safety, limiting traffic flow and congestion and maximizing the . . . center's normal business operations." Macerich does not contend that any of these reasons qualify as a compelling state interest for purposes of strict scrutiny, nor could it. Safety concerns are blind to the content of the speech being regulated, so Macerich's position is undermined by the fact that the WP Rules do not apply to all speech.

strict scrutiny. And, significantly, the WP Rules contain manner restrictions that have gone unchallenged by Best Friends. More importantly, *Pruneyard Shopping Center v. Robins* (1980) 447 U.S. 74, 83 [64 L.Ed.2d 741, 100 S.Ct. 2035], resolved the taking issue when it held that California's "requirement that [a shopping center] permit [people] to exercise state-protected rights of free expression and petition on shopping center property clearly does not amount to an unconstitutional infringement of . . . property rights under the Taking Clause."

## DISPOSITION

The order denying Best Friend's motion for preliminary injunction is reversed. Pending final resolution of the litigation below, Macerich may not prohibit Best Friends or PAPLA from protesting within aural and visual range of Barkworks when Westside Pavilion is open to the public unless Macerich proves that PAPLA cannot protest in any manner in a particular place or on particular days without substantially interfering with normal business operations.

Best Friends is entitled to recover its costs on appeal.

Doi Todd, Acting P. J., and Chavez, J., concurred.